## WARD v. FEDERAL COMMUNICATIONS COMMISSION (NORTHERN COR-PORATION, Intervener).

### No. 7251.

United States Court of Appeals for the District of Columbia.

Decided Nov. 13, 1939.

Paul D. P. Spearman, Alan B. David, and Frank Roberson, all of Washington, D. C., for appellant.

Hampson·Gary, William H. Bauer, Fanney Neyman, William J. Dempsey, and

Andrew G. Haley, all of the Federal Communications Commission, for appellee.

Arthur W. Scharfeld, Philip G. Loucks, Joseph F. Zias, and J. P. Tumulty, all of Washington, D. C., for intervener.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

MILLER, Associate Justice.

This is a companion case to Yankee Network, Inc., v. Federal Communications Commission, recently decided by this court.[1] It arose out of the same proceeding before the Commission, and was argued and submitted on the same record. J. T. Ward, appellant in the present case, is the owner of Station WLAC, located at Nashville, Tennessee, which is licensed by the Commission to operate on kilocycle frequency 1470, with 5 kilowatts power day and night. Appellant intervened before the Commission in the hearing upon the application of The Northern Corporation for a license to operate its Station WMEX on the same frequency (1470); and appealed from its decision granting the application.

The Commission urges on this appeal that appellant has on file with it an application for modification of license to permit an increase in power on behalf of his Station WLAC, and for a construction permit, which application has not yet been acted upon; consequently, that he has no standing to appeal to this court under Section 402(b) (1) of the Communications Act.[2] That, however, does not operate to cut off any right which may exist in appellant's favor under Section 402(b) (2); and it is under the latter provision that he asserts his rights as an aggrieved person on the present appeal.

■ One reason of appeal assigned by appellant in the present case involves the issue of economic interest. Upon that issue our decision in the Yankee Network case is controlling, and in that respect, therefore, the determination of the Commission was correct; both as concerns Station WLAC, and Station WAAB, belonging to The Yankee Network, Inc.

■ Another reason assigned is that if the protested decision—permitting Station WMEX in Boston to operate on kilocycle frequency 1470—is allowed to stand, objectionable electrical interference will be caused in the area, surrounding Nashville, now served by appellant's Station WLAC. The Commission does not concede that this assignment "gives appellant a locus standi under Section 402(b) (2)", but assumes it arguendo. The considerations upon which we held, in the Yankee Network case, that injury to economic interests may be sufficient to bring a station license holder within the terms of Section 402(b) (2) as an aggrieved person, are equally applicable in the case of objectionable electrical interference.[3] The question then arises whether the Commission's findings and determination concerning the question of electrical interference find substantial evidential support in the record. In the opinion of the court they do, and, consequently, the assigned reason of appeal is not supported by the record.

■ From the Commission's statement of facts it appears that Station WLAC, and Station KGA at Spokane, Washington, each operate on kilocycle frequency 1470, with 5 kilowatts power. Both are regional stations as distinguished from clear channel stations. Station WMEX at Boston, Massachusetts, now operates on the 1500 kilocycle frequency, with power of 100 watts night, 250 watts day. The Commission's decision, which is challenged on this appeal, granted a construction permit to the licensee of Station WMEX for operation on the 1470 kilocycle frequency, and to use 5 kilowatts power, unlimited time. The result of this would be to establish three regional stations on this (1470) frequency instead of the two now existing.[4]

In its grounds for decision the Commission found that: "4. The granting of the application [for Station WMEX in Boston operating on the kilocycle frequency of 1470, with 5 kilowatts power, unlimited time, using directional antenna both day and night] would not result in inter-

---

[1] 107 F.2d 212, 71 App.D.C. 11.

[2] Act of June 19, 1934, 48 Stat. 1064, 1093, 47 U.S.C.A. § 402(b)(1).

[3] And see Federal Radio Comm. v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406.

[4] See Commission's Rule 119: "The following frequencies are designated as high power regional frequencies and allocated for use by high power regional stations permitted to operate simultaneously with a power not less than 5 kilowatts: 1,460, 1,470, 1,480 and 1,490 kilocycles."

ference within the normally protected service area of any existing station." [Language within brackets supplied] In its statement of facts the Commission found, among other things, that a regional station such as WLAC "is usually considered as not entitled to protection against interference within its service area by the operation of another station except to its 1 millivolt per meter contour at night." It found further that "The proposed directional antenna system of the applicant [Station WMEX] will suppress radiation toward Nashville so that interference with the primary service of Station WLAC will not occur within the 0.472 millivolt per meter ground wave contour. This is less interference than that already encountered from Station KGA now operating on 1470 kc and producing interference at the 0.56 millivolt per meter ground wave contour of Station WLAC."

These findings of basic facts fully support the finding of ultimate fact[5] set out in the Commission's grounds for decision and are themselves fully supported by substantial evidence in the record. Expert witnesses representing appellant, intervener, and the Commission, all testified that the normally protected service areas of regional stations such as WLAC is the 1 millivolt per meter contour, according to the then existing allocation standards of the Commission's Engineering Department and good engineering practice. Expert witnesses representing the Commission and the intervener testified that interference will not occur within this normally protected area of Station WLAC if Station WMEX operates, as proposed, on kilocycle frequency 1470 with directional antenna.

But appellant contends further that the Commission's determination must be judged not upon the basis of the status quo, but in the light of his application, now pending before the Commission, for authority to increase Station WLAC's power from 5 to 50 kilowatts. He urges that electrical interference would be so greatly increased if Station WLAC used 50 kilowatts power, as to foreclose the possibility of successful broadcasting by either Station WLAC or Station WMEX except in small radii close to Nashville and Boston; hence, that the Commission's decision in effect disposes of appellant's pending application for an increase of power, even before the application has been heard.

Appellant's position, interpreted in the light of this contention, may be summarized briefly as follows: Station WLAC has for a number of years been rendering acceptable service in the Nashville area beyond its normally protected 1 millivolt per meter contour; it has built up a large listening public and a substantial advertising service based upon that fact; for a number of years it has endeavored to secure approval of its use of 50 instead of 5 kilowatts power, in order better to serve the area which it now serves; Station KGA at Spokane, Washington, is now the only other station operating on the 1470 kilocycle frequency; if Station WMEX can be kept off this frequency and —as appellant frankly points out in his brief—if his pending application "for an increase in the power of station WLAC from 5000 watts to 50,000 watts be granted, then its classification *will automatically become* a Class I-B Station. * * *" [Italics supplied], which means that, according to appellant's interpretation of the "Standards of Good Engineering Practice",[6] "drawn so as to conform with the Havana Treaty",[7] the granting of appellant's application for 50 kilowatts pow-

---

5 See Tri-State Broadcasting Co., Inc. v. Federal Communications Comm., 68 App.D.C. 292, 294, 96 F.2d 564, 566; Saginaw Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 282, 287–288, 96 F.2d 554, 559–560, cert. denied, 305 U.S. 613, 59 S.Ct. 72, 83 L. Ed. 391.

6 Standards of Good Engineering Practice Concerning Standard Broadcast Stations (550–1600kc). For the background of these standards see 4 Fed.Reg. 2862 (1939).

7 The North American Regional Broadcasting Agreement entered into at Havana, Cuba, on December 13, 1937. The pertinent portions of the Agreement are set out in appellant's brief, as follows:

"Class I-B: A Class I station which operates with power of not less than 10 kw or more than 50 kw and which has its primary service area free from objectionable interference from other stations on the same and adjacent channels and its secondary service area free from objectionable interference from stations on the same channel, in accordance with the

er would automatically convert Station WLAC from a regional to a clear channel station,[8] and protect its secondary service area from objectionable electrical interference; a protection to which regional stations are not entitled[9] even un-

engineering standards hereinafter set forth.

"(a) When two Class I-B stations on the same channel are separated by a distance of 2800 miles or more, neither station shall be required to install a directional antenna.

"(b) When two Class I-B stations on the same channel are separated by a distance of more than 1800 miles and less than 2800 miles, it will, in the absence of proof to the contrary, be assumed that each station is free of objectionable interference caused by the other and neither shall be required to install directional antennas or take other precautions to avoid such interference. In case the existence of objectionable interference is proved, the governments concerned will consult with each other regarding the desirability and practicality of installation of directional antennas or the taking of other precautions to eliminate the interference and will determine by special arrangement the measures, if any, to be taken.

"(c) When two Class I-B stations on the same channel are separated by a distance less than 1800 miles, it will, in the absence of proof to the contrary, be assumed that the installation of directional antennas or the taking of other precautions to avoid interference is necessary, and the governments concerned will consult with each other and will take such measures as may be agreed upon between them to the end that the objectionable interference may be reduced or eliminated.

"Class II: A 'secondary' station which operates on a clear channel and is designed to render service over a primary service area which, depending on geographical location and power used, may be relatively large, but which is limited by and subject to such interference as may be received from Class I stations. A station of this class shall operate with power of not less than 0.25 kw or more than 50 kw. Whenever necessary a Class II station shall use a directional antenna or other means to avoid interference, in accordance with the engineering standards hereinafter set forth, with Class I stations and with other Class II stations."

8 The conclusion does not necessarily follow, in any event, because the standards referred to recognize that Class II stations may operate with 50 kw power also.

9 The relevant paragraphs in the section of "Standards of Good Engineering Practice concerning Standard Broadcast Stations (550-1600 kc)" appear in appellant's brief as follows:

"Class I stations are dominant stations operating on clear channels and are subdivided into two classes as follows:

"(a) Class I-A stations * * *

"(b) Class I-B stations operate with powers not less than 10 kw or more than 50 kw and have their primary service areas free from objectionable interference from other stations on the same and adjacent channels and secondary service areas free from objectionable interference from stations on the same channel as follows: During nighttime hours of operation stations are protected to the 500 uv/m 50 per cent sky wave contour and during daytime hours of operations to the 100 uv/m groundwave contour from stations on the same channel. Protection is given to the 500 uv/m groundwave contour from stations on adjacent channels for both day and nighttime operation. Two or more Class I-B stations and Class II stations may operate on a clear channel day and night provided the above protections are given to the Class I-B stations.

"Class II stations are secondary stations which operate on clear channels with powers not less than 0.25 kw or more than 50 kw. These stations are required to use a directional antenna or other means to avoid causing interference within the normally protected service areas of Class I stations or other Class II stations. These stations normally render primary service only, the area of which depends on the geographical location, power and frequency. This may be relatively large but is limited by and subject to such interference as may be received from Class I stations. However, it is recommended that Class II stations be so located that the interference received from Class I stations will not limit the service area to greater than the 2500 uv/m groundwave contour which is the value for the mutual protection of this class of station with other stations of the same class.

"The several classes of broadcast stations have in general three service areas: namely, primary, secondary, and intermittent service areas. Class I stations render service to all three service areas. Class II stations render service to a primary area but the secondary and inter-

der the Standards upon which appellant relies. Moreover, appellant's hopes in this respect are even more clearly revealed by evidence, which he introduced at the hearing, to the effect that Station KGA at Spokane, Washington, has an application pending before the Commission to change its frequency from 1470 to 950 kilocycles. In the event this application were granted, presumably, Station WLAC's service would have no limitation due to interference from any station on the 1470 kilocycle frequency.

Perhaps it would have been wiser, as a matter of administrative practice, for the Commission to hear and determine, together, the applications of the owners of Stations WMEX, WLAC and KGA. But the Commission asserts, and appellant does not deny, that he made no effort to have his application heard at the same time as the application of the intervener pursuant to the Commission's rule.[10]

Moreover, appellant made no mention of the pending application in his protest against the Commission's decision concerning Station WMEX. That protest spoke solely in terms of then existing broadcasting conditions. It was not until the hearing—on the application of Station WMEX—was in progress that appellant indicated a desire to enlarge the issue to include consideration of his pending application; and then only by questions propounded to witnesses on examination. The Commission, in its grounds for decision,[11] and its statement of facts,[12] voluntarily recognized the pendency of appellant's application. Appellant then incorporated into his statement of reasons of appeal, the voluntary recognition of a pending application, thus written into its decision by the Commission.[13] Were it not for the facts last stated the record would be bare of any showing upon the point. But it is upon this basis that appellant now asserts error upon the part of the Commission.

[4, 5] We have said that if the Commission's prior consideration of a previously filed and copending application—where request has been made for joint consideration—has "seriously prejudiced" an applicant we would have a case in which we might say that the latter applicant has an appealable interest as a person aggrieved.[14] However, we cannot say, under the circumstances of the present appeal, that appellant has been prejudiced as a matter of law.[15] The Commission's rule,[16] permitting a joint hearing of pending applications, is certainly a reasonable one. As appellant, full-handed with knowledge of

mittent service areas may be materially limited or destroyed due to interference from other stations depending on the station assignments involved. Class III and IV stations usually have only primary service areas as interference from other stations generally prevents any secondary service and may limit the intermittent service area. However, complete intermittent service may be obtained in many cases depending on the station assignments involved."

[10] Rule 106.4: "In fixing dates for hearings the Commission will, so far as practicable, endeavor to fix the same date for hearings on all related matters which involve the same applicant, or arise out of the same complaint or cause; and for hearings on all applications which by reason of the privileges, terms, or conditions requested present conflicting claims of the same nature, excepting, however, applications filed after any such application has been designated for hearing."

[11] "5. The showing made by the applicant [Station WMEX] is sufficient to entitle it to the grant of its application, notwithstanding the pending application of WLAC, Inc."

[12] "Station WLAC has pending an application for permit to operate with 50 kilowatts power, but that is not an inhibition against the lawful exercise of the judgment of the Commission upon the matter under consideration."

[13] "19. The Commission erred in concluding '5. The showing made by the applicant is sufficient to entitle it to the grant of its application notwithstanding the pending application of WLAC, Inc.'

"(a) This conclusion is not supported by any findings of basic fact;

"(b) There are no basic facts in the record of evidence which could be found to support it, and

"(c) Is an adjudication of the WLAC application without notice or opportunity to be heard in direct violation of the Fifth Amendment to the Constitution of the United States."

[14] Pittsburgh Radio Supply House v. Federal Communications Comm., 69 App. D.C. 22, 25, 98 F.2d 303, 306. Cf. Colonial Broadcasters, Inc. v. Federal Communications Comm., 70 App.D.C. 258, 105 F.2d 781.

[15] See WGN, Inc. v. Federal Radio Comm., 62 App.D.C. 385, 387, 68 F.2d 432, 434.

[16] Rule 106.4, supra note 10.

the situation, failed to request such a joint hearing, he is in no position to demand—and we have no power to require[17]—that the Commission suspend its normal functions and reopen its proceedings in order to determine the large questions which he seeks now to have determined. For, indeed, large and important questions will be involved in determining whether the Commission's Rule 119 should be amended[18] and kilocycle frequency 1470 reallocated[19] for clear channel purposes; whether the classification of Station WLAC should be changed from a regional to a clear channel station;[20] whether Station WLAC should be required to install directional antenna; whether Station KGA should be permitted to change its frequency from 1470 to 950 kilocycles; whether or not—and if so to what extent—the Commission should integrate into its rules the "Standards of Good Engineering Practice" or provisions of the Havana Treaty.[21]

■■ So long as the Commission complies with the mandate of the statute it has, and should have, wide discretion in determining questions both of public policy and of procedural policy, and in making and applying appropriate rules therefor.[22] It is not the function of this court to direct the Commission as to the routine of its administrative procedure, so long as it conforms to the law.[23] No violation of law is revealed by the record or shown by appellant.

In view of our determination of the foregoing questions it is unnecessary to consider other assignments and contentions presented by appellant.

Appeal dismissed.

---

[17] Pittsburgh Radio Supply House v. Federal Communications Comm., 69 App. D.C. 22, 25, 98 F.2d 303, 306.

[18] Pittsburgh Radio Supply House v. Federal Communications Comm., 69 App. D.C. 22, 25, 98 F.2d 303, 306: "Here Pittsburgh has applied for a grant which would be in direct violation of Rule 120, and it can succeed in its objective only by inducing the Commission to change the rule. This is a matter so wholly of policy under the provisions of the Act and so peculiarly within the special and expert knowledge of the Commission that to undertake to control it judicially would be clearly an impingement upon the jurisdiction of the Commission. The Commission has in the past considered whether Rule 120 ought to be changed in the manner Pittsburgh requests, but no change has been made and, while the question may be said to be still open, we have no reason to assume it will be changed and certainly no right to say that the Commission should suspend its functions pending its determination of that question."

[19] "119. The following frequencies are designated as high power regional frequencies * * *: 1,460, 1,470, 1,480, and 1,490 kilocycles."

[20] In the case of regional stations it may be necessary in the public interest that the Commission should permit some electrical interference. WREC, Inc. v. Federal Radio Comm., 62 App.D.C. 312, 313, 67 F.2d 578, 579. Obviously, it is not possible to secure a nation-wide classification and operation of local, regional and clear channel stations without some such interference.

[21] See WREC, Inc. v. Federal Radio Comm., 62 App.D.C. 312, 313, 67 F.2d 578, 579.

[22] See Communications Act, § 303(f), 48 Stat. 1082, 47 U.S.C.A. § 303(f); Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 126–127, 94 F.2d 249, 251–252; Heitmeyer v. Federal Communications Comm., 68 App.D.C. 180, 187, 95 F.2d 91, 98.

[23] Communications Act, §§ 303, 307, 309, 402, 48 Stat. 1082, 1083, 1085, 1093, 47 U.S.C.A. §§ 303, 307, 309, 402. Pottsville Broadcasting Co. v. Federal Communications Comm., 69 App.D.C. 7, 10, 98 F.2d 288, 291: "We never have assumed, however, and do not intend now to assume, such supervisory control of questions of policy. We think it perfectly clear it is the intent of the statute that such matters should be left wholly in the hands of the Commission * * *."