## DELSNIDER v. GOULD et al.
### No. 9003.

United States Court of Appeals
District of Columbia.

Submitted Feb. 4, 1946.

Decided March 25, 1946.

As Amended April 26, 1946.

Mr. Thomas J. Ahern, of Washington, D. C., for appellant.

Messrs. W. Cameron Burton and Thomas B. Heffelfinger, both of Washington, D. C., for appellees.

Mr. James A. Crooks, General Counsel, Office of Rent Control for the District of Columbia, of Washington, D. C., submitted a brief as amicus curiae, on behalf of Robert F. Cogswell, of Washington, D. C., Administrator of Rent Control.

Before EDGERTON, WILBUR K. MILLER, and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

This case arose under that section of the District of Columbia Emergency Rent Act[1]

---

[1] Act of Dec. 2, 1941, 55 Stat. 794, ch. 553, § 10(a), D.C.Code 1940, § 45—1610 (a). "If any landlord receives rent or refuses to render services in violation of any provision of this chapter, or of any regulation or order thereunder prescribing a rent ceiling or service standard, the tenant paying such rent or en-

which provides that if a landlord receives rent in excess of the maximum-rent ceiling, the tenant may recover double the amount of the excess, plus costs and attorneys' fees. Appellees were tenants of a dwelling under an eight-month lease dated August 1, 1943. They brought action against their landlord, appellant here, claiming that whereas the maximum-rent ceiling for the leased accommodations was $15.50 * a month, they had paid $100 a month for eight months and $85 a month for the succeeding two months, making an excess of $815. Wherefore, they demanded judgment for $1,630, plus attorney's fees and costs.

The Municipal Court directed a verdict for double the difference between $85 and $100 a month for eight months, upon the ground that the maximum-rent ceiling for the accommodations was $85 a month. The Municipal Court of Appeals reversed the judgment, holding that the ceiling was $18.-50 * a month and the tenants were entitled to double the difference between that sum and the amounts paid. 42 A.2d 140. Because of the importance of the question, we allowed an appeal from that judgment.

The appellant-landlord purchased the premises in February, 1942. On it then, and on January 1, 1941, was a frame building described in the evidence as "a shack". There was no water in it, no plumbing, no electricity and no toilet. There was an outdoor toilet in the back yard. The house was heated by kerosene stoves put in by the tenants. There was "a certain amount" of paper on the walls, and the plaster "was terrible". It was then rented unfurnished at $15.50 * a month.

The new owner, appellant, installed water, plumbing and electricity, and a bathroom with tub and over-hanging shower; finished the walls with Celotex, and installed an electric refrigerator and an electrically-controlled kerosene furnace, known as an "Air-o-Flame", designed to heat six or eight rooms. She rebuilt the front entrance, planted flowers in the yard and made an entrance to it through an outside gate. She made repairs, including repainting; laid a new floor in the living room, and supplied screens. She then completely furnished the house—living room, kitchen, bath, two bedrooms and porch, except for silver and linen.

The place was vacant when purchased by appellant and remained so for more than a year. On April 1, 1943, she rented it temporarily and unfinished, as an accommodation to a friend who was in the process of remodeling her own home. On August 1, 1943, she rented it to appellees under the lease to which we have referred, the stated rental being $100 a month.

On September 29, 1943, the landlord filed with the Administrator of Rent Control an "Application for Maximum Rent Ceiling on Rented Single Dwelling". She stated that the "housing accommodations" for which the application was filed had not been rented on January 1, 1941, or during 1940. A full description of the dwelling as she had rented it, with its equipment and furnishings, was attached. After a hearing, in the course of which the property was inspected by representatives of the Administrator, the latter, on March 27, 1944, determined that $85 a month did not exceed the rate generally prevailing for comparable housing accommodations, and fixed the maximum-rent ceiling at that amount.

Later, on June 30, 1944, the Administrator, after notice, issued an order in which he recited that the "premises" involved had been rented on January 1, 1941, at $18.50 a month; that this information had not been disclosed to him, but that, on the contrary, the landlord had represented to him in her application that the "premises" had not been rented on January 1, 1941, or during 1940.

---

titled to such service, or the Administrator on behalf of such tenant, may bring suit to rescind the lease or rental agreement, or, in case of violation of a maximum-rent ceiling, an action for double the amount by which the rent paid exceeded the applicable rent ceiling and, in case of violation of a minimum-service standard, an action for double the value of the services refused in violation of the applicable minimum-service standard or for $50, whichever is greater in either case, plus reasonable attorneys' fees and costs as determined by the court. Any suit or action under this subsection may be brought in the municipal court of the District of Columbia regardless of the amount involved, and the municipal court is hereby given exclusive jurisdiction to hear and determine all such cases."

* Plaintiffs alleged in their complaint that the rent ceiling was $15.50 a month, and a witness testified that such was the rent on January 1, 1941. Another witness said that the rent from July 18, 1941, was $18.50 a month. The Administrator found that the monthly rent on January 1, 1941, was $18.50.

He, therefore, rescinded his order of March 27, 1944.

On July 5, 1944, the landlord filed a petition for a "rent adjustment" under Section 4(b) of the Rent Act.[2] Hearings were had, and on December 2, 1944, the Administrator dismissed the proceedings because the lease had expired, the tenants had moved out on September 1, 1944, and, in his view, the matter was moot. Meantime, sometime prior to September 6, 1944,[3] the tenants had commenced the present action.

The District of Columbia Emergency Rent Act resulted from extensive hearings on a series of bills presented to the Congress by various interests concerned with the rental problem created by emergency conditions in the District in 1941.[4] The final bill, which became the Act, embodied, said the House Committee on the District of Columbia, the best features of all the recommendations submitted by interested sponsors, including the Office of Price Administration, the Washington Housing Association, the Washington Industrial Union Council and the Washington Real Estate Board. The

Senate Committee also held public hearings, attended by representatives of the same and other interested organizations.[5] Meticulous amendments were made by the Senate Committee. Thus, we can be sure that the structure and language of the Act were carefully selected to effectuate plans carefully formed.

"Particularly important," said the House Committee, "is the definition of 'housing accommodations.'" This definition is, indeed, the basic concept of the statute.

The section of the Act which prescribes maximum-rent ceilings is divided into three subparagraphs.[6] The maximum-rent ceiling for housing accommodations rented on January 1, 1941, is the rent to which the landlord was entitled on that date. The ceiling for housing accommodations not rented on January 1, 1941, nor within the year ending on that date, is the rent generally prevailing for comparable housing accommodations as determined by the Administrator.

"Housing accommodations" are defined[7] to mean the building, or part thereof, the

---

[2] 55 Stat. 790, ch. 553, D.C.Code 1940, § 45—1604(b). "Any landlord may petition the Administrator to adjust the maximum-rent ceiling or minimum-service standard, or both, applicable to his housing accommodations to compensate for (1) a substantial rise, since January 1, 1941, in taxes or other maintenance or operating costs or expenses, or (2) a substantial capital improvement or alteration made since January 1, 1941; whereupon the Administrator may by order adjust such maximum-rent ceiling or minimum-service standard in such manner or amount as he deems proper to compensate therefor, in whole or in part, if he finds such adjustment necessary or appropriate to carry out the purposes of this chapter: Provided, That no such adjusted maximum-rent ceiling or minimum-service standard shall permit the receipt of rent in excess of the rent generally prevailing for comparable housing accommodations as determined by the Administrator."

[3] The case was tried on an amended complaint. The date of filing the original complaint is not shown, but the answer to it was filed September 6, 1944.

[4] H. R. Rep. 1317, 77th Cong., 1st Sess. (1941).

[5] Sen. Rep. No. 827, 77th Cong., 1st Sess. (1941).

[6] 55 Stat. 788, ch. 553, § 2, D.C.Code 1940, § 45—1602(1). "(1) On and after the thirtieth day following the enactment of this chapter, subject to such adjustments as may be made pursuant to sections 45—1603 and 45—1604 [sections 3 and 4 of the Act], maximum-rent ceilings and minimum-service standards for housing accommodations excluding hotels, in the District of Columbia shall be the following:

"(a) For housing accommodations rented on January 1, 1941, the rent and service to which the landlord and tenant were entitled on that date.

"(b) For housing accommodations not rented on January 1, 1941, but which had been rented within the year ending on that date, the rent and service to which the landlord and tenant were last entitled within such year.

"(c) For housing accommodations not rented on January 1, 1941, nor within the year ending on that date, the rent and service generally prevailing for comparable housing accommodations as determined by the Administrator."

[7] 55 Stat. 794, ch. 553, § 11, D.C.Code 1940, § 45—1611(a). "(a) The term 'housing accommodations' means any building, structure or part thereof, or land appurtenant thereto, or any other real or personal property rented or offered for rent for living or dwelling purposes in the District of Columbia (including, but without limitation, houses, apartments, hotels, rooming- or boarding-house accommodations, and other properties used for living or dwelling

land appurtenant thereto, and any other real or personal property rented or offered for rent for living purposes, together with all "services" supplied in connection with the use or occupancy of such property. "Services" are defined [8] to include not only services customarily considered as such, e. g., light, heat, etc., but also furnishings, furniture, window shades, screens, awnings and "facilities", including kitchen, bath and laundry "facilities", and any other "facility" connected with the use or occupancy of the house.

Thus, the basic concept of the Act is clear and unmistakable. The unit for which a rent ceiling was fixed is not the real estate, or the premises, but the combination of real estate, all personal property, all facilities and all services connected with the use or occupancy and for which the rent was payable. The purpose is obvious. If the ceiling had been fixed for the premises alone, landlords could remove with complete immunity the accessory personal property, facilities and services to the detriment of tenants. The result would have been nullification of rent control. Also, it is clear that the proper rents for two identical buildings, one rented bare and the other completely equipped, furnished and serviced, would be widely different figures. The whole statute is built around the idea of a "housing accommodation" which includes all elements.

The question in the case at bar is whether the "housing accommodations" rented to the appellee-tenants in August, 1943, had been rented during 1940 or on January 1, 1941. If so, the statutory ceiling was the rent then payable. If not, the statutory ceiling was the rent generally prevailing for comparable accommodations, a fact to be determined by the Administrator.

The Municipal Court of Appeals followed the erroneous view of the Administrator that the statute fixed a rent ceiling for the *premises,* and that, therefore, if the *premises* were rented on January 1, 1941, that rent was the ceiling for the premises. That

error runs through the entire case. The Administrator said in his order of June 30, 1944, that the landlord had represented to him that the "premises" had not been rented on January 1, 1941, or during 1940, and he treated that as a false representation. In the first place, the landlord did not represent that the "premises" were not rented on the critical date. She stated that the "housing accommodations", which by statutory definition meant the combination of real estate, personal property, furnishings, facilities and services were not rented. She maintains that view in this court. In the second place, the point of inquiry was not, as the Administrator said, whether the premises were rented, but was, as the landlord put it, whether the *housing accommodations* rented to these appellees were rented, on the critical date. Thus, her representation was not a false one, but was a difference of view as to the meaning of the statute, and we think her view was correct.

The statute prescribes two lines of procedure, the choice between which is pertinent to this case. If the housing accommodations involved were not rented on the critical date, the statute prescribes that the rent ceiling "shall be * * * the rent * * * generally prevailing for comparable housing accommodations as determined by the Administrator."[9] If, on the other hand, the housing accommodations involved were rented on the critical date and the landlord has later made "a substantial capital improvement or alteration", he must petition the Administrator "to adjust" the ceiling.[10] The Administrator may then adjust the ceiling "in such manner or amount as he deems proper to compensate" for the improvement or alteration, limited to a maximum equal to the rent generally prevailing for comparable accommodations. Thus, there is a critical difference between new housing accommodations and old ones with substantial improvements or alterations.

The question whether the housing accommodations involved are new ones not rented on the critical date, or are old ones

---

purposes) together with all services supplied in connection with the use or occupancy of such property."

[8] 55 Stat. 794, ch. 553, § 11, D.C.Code 1940, § 45—1611(b). "(b) The term 'services' includes the furnishing of light, heat, hot and cold water, telephone, elevator service, furnishings, furniture, window shades, screens, awnings, and storage, kitchen, bath, and laundry facilities and privileges, maid service, janitor service, the removal of refuse, and the making of all repairs suited to the housing accommodations or necessitated by ordinary wear and tear, and any other privilege or facility connected with the use or occupancy of housing accommodations."

[9] Sec. 2(1) (c), supra note 6.

[10] Sec. 4(b), supra note 2.

with substantial capital improvements or alterations, is a question of fact, which, in an action such as that at bar, must, unless the evidence is compelling one way or the other, be decided by the jury. The answer may be elusive and the line difficult to determine in some cases; but there is a line. If, on January 1, 1941, there were on a given lot a one-story, frame shack, and thereafter the owner tore down the shack and built a new, two-story, brick dwelling with completely modern equipment, there could be no doubt that the latter housing accommodations were new. If, on the other hand, a dwelling were rented on the critical date and thereafter the landlord moved a partition or, as in Gilbert v. Thierry,[11] merely installed a mechanical refrigerator, the resulting accommodation is not new but is the old with improvements or alterations. Between these two extremes is a difference which grows less clear as the borderline is approached. By analogy, it is not unlike the line between repairs and capital improvements with which business men and accountants are almost daily concerned and with which the courts must frequently deal.

In the present case, we think only one conclusion possible. The evidence is vivid and compelling. The completely equipped and furnished house rented to these appellees was a new housing accommodation not theretofore rented. A contrary conclusion, that this combination of house, facilities, equipment and furnishings, fairly worth $85 a month by the Administrator's finding, was the same as the "shack in a terrible condition" rented at these premises on January 1, 1941, for $15.-50 a month, could not have been sustained.

Upon the foregoing premise, the general practice of the Administrator applying to accommodations newly offered should govern the applicable rent. The practice has been to treat the rent payable under the lease as controlling and valid for the period prior to the Administrator's finding as to comparable rent.[12] The effect of this practice, under our view of the statute, is to assume, pending the Administrator's action, that the rent first collected is the rent generally prevailing for comparable accommodations. This seems to be a satisfactory practical solution of a difficult administrative problem. It is true that in the present case the Administrator set aside his order determining the rent ceiling. But since the basis for his rescission was the clearly erroneous finding that the landlord had made a misrepresentation; and since the comparable rent generally prevailing was a fact, which, when ascertained by him, became controlling by statute, his rescission must be disregarded. Legally speaking, it was an abuse of discretion.

It follows that the maximum rent ceiling for the housing accommodations rented to these appellees was the rent payable under the lease ($100 a month) until the order of the Administrator of March 27, 1944, and thereafter was the amount found by him to be the rent generally prevailing for comparable housing accommodations ($85 a month). The trial court should have instructed the jury accordingly, and there should have been no recovery against appellant. Also involved in the action before the trial court was a counter-claim, disputed only as to monthly amount, by the landlord for three months unpaid rent. The proper amount, as we have determined above, is $85 a month. The trial court directed a verdict in favor of plaintiffs in the sum of $240, and in favor of defendant in the sum of $255 on the counter-claim. Judgment was entered accordingly.

The judgment of the Municipal Court of Appeals is reversed with instructions to affirm that part of the judgment of the Municipal Court in favor of defendant upon the counter-claim, and to remand the case to that court for a new trial upon plaintiffs' claim.

Reversed with instructions.

---

[11] D.C.Mass.1944, 58 F.Supp. 235, affirmed 1 Cir., 1945, 147 F.2d 603.

[12] By General Order No. 1, February 2, 1942, the Administrator ruled that, pending his determination, he would assume that the first rent collected was "fair and reasonable". By General Order No. 6, September 30, 1942, he ruled that pending the filing of an application, the ceiling for newly-offered property was zero, and that after the filing and until his actual determination, the first rent received should be the ceiling. The "zero" provision was held invalid by the Municipal Court in Van Mechelen v. Block, Mun.Ct.D.C., No. 420,644, decided Sept. 2, 1943, and not appealed. General Order No. 6 was rescinded November 3, 1943, by General Order No. 11, which recited no new rule except that applications must be filed before future tenancy begins. This latter order was issued after the property in the present case had been leased.