BEAUMONT BROADCASTING CORP. v.
FEDERAL COMMUNICATIONS COM-
MISSION et al.

No. 10888.

United States Court of Appeals
District of Columbia Circuit.

Argued March 12, 1952.

Decided June 26, 1952.

Intervenor's Petition for Rehearing
Denied Oct. 10, 1952.

Paul M. Segal, Washington, D. C., with whom George S. Smith, Philip J. Hennessey, Jr., and Harry P. Warner, Washington, D. C., were on the brief, for appellant. Quayle B. Smith, Washington, D. C., also entered an appearance for appellant.

Richard Solomon, Counsel, Federal Communications Commission, Washington, D. C., with whom Benedict P. Cottone, General Counsel, Federal Communications Commission, Max Goldman, Asst. General Counsel, Federal Communications Commission, and Mary Jane Morris, all of Washington, D. C., were on the brief, for appellee.

William Thomson, Washington, D. C., with whom George O. Sutton, Washington, D. C., was on the brief, for intervenor.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

Beaumont Broadcasting Company, appellant, and Ozarks Broadcasting Company, intervenor, enjoy simultaneous use of the 560 kilocycle band for standard broadcasting. Because of their geographical separation and limited broadcasting power, each station has long operated without causing electrical interference to the other. In 1945, however, a chain of events was set in motion which ended this state of affairs and ultimately resulted in the present litigation. To understand the issues before us, we must relate the administrative developments as they unfolded.

In November of 1945, Beaumont filed an application for an increase in power from 1000 to 5000 watts. Because the Commission thought the grant of this proposal would not cause electrical interference within the normally protected service area of any other station, it concluded that there was no need for a hearing and approved the proposal on February 22, 1947. Some five months earlier, however, Ozarks had also sought permission to increase its signal strength to 5000 watts. This proposed signal would produce electrical interference in the new area reached by the expanded Beaumont signal. Ozarks regarded Beaumont's expanded area as a potential obstacle to its own planned extension [1] and concluded, apparently correctly,[2] that the Commission had overlooked the pending Ozarks' application when it granted Beaumont's application without a hearing. Accordingly, Ozarks petitioned the Commission to modify Beaumont's grant, making it subject to subsequent interference from the proposed Ozarks extension or, in the alternative, to set aside Beaumont's grant and schedule both the Beaumont and Ozarks applications for a consolidated hearing.[3]

Acting upon that petition, the Commission concluded in 1947[4] that the amount of electrical interference which Beaumont's "expanded" area would suffer from a grant of

1. See Ashbacker Radio Corp. v. Federal Communications Comm., 1945, 326 U.S. 327, 331–333, 66 S.Ct. 148, 90 L.Ed. 108.

2. J.A., p. 19.

3. Id. at 12.

4. The initial decision and order were dated August 21, 1947, J.A., p. 10. On Beaumont's petition for reconsideration, a second memorandum opinion and order were adopted December 18, 1947, J.A., p. 14.

the Ozarks' application was "not substantial,"[5] and that the Ozarks and Beaumont proposals were not mutually exclusive.[6] It also pointed out that "the public interest would be better served by an immediate grant of the [Beaumont] application subject to any interference that might result [to Beaumont] if the [Ozarks application] were subsequently granted"[7] than by the delays inherent in the comparative evaluation of the Ozarks and Beaumont proposals. The Commission carefully pointed out, however, that the applicants were entitled to a comparative hearing, and that if *"for any reason"* Beaumont did not wish to accept the grant so conditioned, it could reject it and make timely application for a comparative hearing with Ozarks.[8] Beaumont did not reject the grant and it did not ask for a comparative hearing.

In due course, Ozarks' own application came on for hearing with Beaumont participating fully in opposition.[9] The proceeding culminated in an order granting Ozarks' application and Beaumont brought this appeal.

█ The Commission's order is attacked here on three grounds. First, Beaumont says that it was illegally denied a comparative hearing in the Ozarks proceedings. It bases its view on the theory that the conditional grant to it in 1948 was not notice that there would be no comparative hearing in the subsequent Ozarks proceedings. We think this position untenable. The Commission's statement already quoted and its announcement that Beaumont could "refuse the grant * * * and demand a comparative hearing" within twenty days[10] were clear notice that the grant to Beaumont was conditioned on a waiver of its right to a comparative hearing. By accepting the grant, Beaumont accepted the condition which was part of it.

A more serious objection, however, goes to the Commission's power under the Federal Communications Act[11] and the Fifth Amendment to condition a grant on the acceptance by the grantee of subsequent electrical interference. Stripped to its essentials, the question is this: where two applications pending before the Commission are not mutually exclusive but nevertheless are of such a nature that a grant of both would cause some interference in the sought-after area of one of the applicants, may the Commission require the applicant whose service will suffer interference either to accept the interference or demand a full hearing on the merits of the competing applications within twenty days?

█ In making the conditional grant to Beaumont, the Commission was acting pursuant to its Rule 1.383 which provides that if an application is granted "subject to any interference that may result to the station if designated application or applications are subsequently granted," the conditional grant shall be considered a grant of the original application unless rejected within twenty days. If rejected, "the Commission will vacate its original action upon the application and set the application for hearing in the same manner as other applications are set for hearing."[12] This rule is designed to assist in the expeditious dispatch of competing applications, "a matter not unrelated to achieving the ends of justice".[13] By

---

5. Id. at 13, 17. This interference occurs only at night, J.A., pp. 37, 42. Beaumont's expanded operations will cause "but slight" interference with Ozarks' expanded operations, J.A., pp. 12, 17

6. J.A., pp. 12–13.

7. Id. at 18.

8. Id. at 19. Emphasis supplied.

9. These hearings were held in August 1948.

10. J.A., p. 19.

11. 48 Stat. 1064 (1934), 47 U.S.C.A. § 151 et seq.

12. 47 Code Fed.Regs. § 1.383 (1949).

13. Federal Communications Comm. v. WJR, 1949, 337 U.S. 265, 282, 69 S.Ct. 1097, 93 L.Ed. 1353. See also Harding College, 4 Pike & Fisher Radio Reg. 104, n. 5 (1948).

In Ashbacker Radio Co. v. Federal Communications Comm., the Supreme Court held that "the Commission, having before it two applications which are mutually exclusive, [cannot grant] one without a hearing and sets the other for hearing." 1945, 326 U.S. 327, 328, 66 S.Ct. 148. The Court pointed out, however, that "[t]he Fetzer application *was not conditionally granted*

making a conditional grant instead of holding Beaumont's application until it could receive simultaneous processing with Ozarks', the Commission enabled one area to receive a service more quickly than it would if it had had to await the outcome of a comparative hearing. This also necessarily meant that Beaumont was enabled to proceed with its plans for expansion sooner than it would have been able to do had it awaited the outcome of a comparative hearing. But to ensure full protection of the public and private interests involved, the rule does provide and the Commission stated that a comparative hearing would be granted if asked for within twenty days. We cannot regard the Commission's action as other than "a satisfactory practical solution of a difficult administrative problem." [14] It violates neither the Federal Communications Act nor the Fifth Amendment.

Beaumont's second attack on the validity of the Commission's order concerns a deviation from one of the provisions of the Commission's Standards of Good Engineering Practice Concerning Standard Broadcasting Stations. To understand this provision, it is necessary to describe a related provision not directly involved here. Under this related provision, each standard radio broadcasting station normally enjoys freedom from objectionable electrical interference up to a point where its broadcast signal is of a designated strength.[15] The imaginary line connecting all of these points in every direction around a station is called the station's "normally protected contour."

Under the provision involved here, the Commission may license a station when the public interest so requires, even though it will receive objectional electrical interference within its normally protected contour. This provision has the effect of dividing the area within the normally protected contour into an interference-free area and an area where the station's signal will be interfered with. If the population residing in the interfered-with area does not exceed ten percent of the population living in the interference-free area, the Commission may license the station.[16] For convenience, this provision is often referred to as the "ten percent rule."

 In this case, the population living in the interfered-with area is approximately 54 percent of the population living in Ozarks' interference-free area, rather than the ten percent named in the Standards. Beaumont regards the grant to Ozarks under these circumstances as a violation of the Standards and therefore as an illegal grant.

We cannot agree. Beaumont's position rests on a misconception of the nature of the Engineering Standards in general, and

---

pending consideration of petitioner's application." Id. 326 U.S. at page 331, 66 S.Ct. at page 150. Emphasis supplied. Moreover, in the Ashbacker case, there was "no suggestion, let alone a finding, by the Commission that the demands of the public interest were so urgent as to preclude the delay which would be occasioned by a hearing." Id. 326 U.S. at page 333, 66 S.Ct. at page 151. By way of contrast, while the Commission was willing to conduct comparative hearings upon timely application in the instant case, it also stated that "the public interest would be better served by an *immediate* [conditional] grant [to Beaumont]." J.A., p. 18. Emphasis supplied.

14. Delsnider v. Gould, 1946, 81 U.S.App. D.C. 54, 58, 154 F.2d 844, 848. "Necessarily * * * the · subordinate questions of procedure in ascertaining the public interest, when the Commission's licensing authority is invoked—the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions—were explicitly and by implication left to the Commission's own devising, so long, of course, as it observes the basic requirements designed for the protection of private as well as public interest." Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 138, 60 S.Ct. 437, 439, 48 L.Ed. 656, quoted with approval in Federal Communications Comm. v. WJR, 1949, 337 U.S. 265, 283, 69 S.Ct. 1097, 93 L.Ed. 1353; cf. Ward v. Federal Communications Comm., 1939, 71 App.D.C. 166, 108 F.2d 486; Colonial Broadcasters, Inc., v. Federal Communications Comm., 1939, 70 App.D.C. 258, 105 F.2d 781.

15. 47 Code Fed.Regs., p. 125 (1949).

16. Id. at 121.

of the ten percent rule in particular. The introduction to the Standards contemplates that they prescribe a flexible general set of rules for the administration of the Federal Communications Act in the public interest, and that the Commission reserves the right to depart from the normal requirements set forth in the Standards when the public interest so requires.[17] As for the ten percent rule itself, the Commission has long recognized that it specifies only a norm, not a hard and fast rule. Both in authorizing and refusing to authorize departures from the ten percent Standard, the Commission has frequently stated that the governing criterion is the public interest.[18]

In this case, the Commission found that the deviation was in the public interest in view of the fact that 30,332 people would receive a night time primary service for the first time.[19] This was held to be consistent with one of the principal objectives of the Communications Act and with a long-standing policy of the Commission, namely, "to provide at least one primary radio service to all substantial populations of this country."[20] We think the Commission's posi-

tion is well within its statutory authority and is amply supported by the evidence.[21]

Beaumont's final objection is that the hearing examiner erred in cutting short its cross-examination of Ozarks' engineering expert. This witness testified that he was unable to design a practicable directional array which would afford protection to all stations operating on 560 kilocycles.[22] Beaumont then attempted to prove that there were one or two directional antenna systems which could afford such protection.[23] The action of the hearing examiner in cutting off this line of inquiry was sustained by the Commission on the ground that an alternative antenna system was not in issue and that Beaumont's proffer was not preceded by a sufficient opportunity for Ozarks to meet technical matters covered by the proffer.[24]

While the Act empowers the Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice",[25] there is no doubt that the Commission's overriding duty is to protect the public con-

---

17. " * * * these standards may go beyond the Rules and Regulations and set up engineering principles for consideration of various allocation problems. * * *

"The Standards of Good Engineering Practice set forth herein are those deemed necessary for the construction and operation of standard broadcast stations to meet the requirements of technical regulations and for operation in public interest along technical lines not specifically enunciated in the reguations. * * *

"While these standards provide for flexibility and set forth the conditions under which they are applicable, it is not expected that material deviation therefrom as to fundamental principles will be recognized unless full information is submitted as to the reasonableness of such departure and the need therefor." 47 Code Fed.Regs., pp. 118–19 (1949); cf. Courier Post Pub. Co. v. Federal Communications Comm., 1939, 70 App. D.C. 80, 85, 104 F.2d 213, 218.

18. Compare On the Air, Inc., 6 Pike & Fisher Radio Reg. 309 (1951); WHP, Inc., 4 Pike & Fisher Radio Reg. 1395 (1949), with Worcester Broadcasting Co.,

5 Pike & Fisher Radio Reg. 1005 (1950); Lansing Broadcasting Co., 5 Pike & Fisher Radio Reg. 48 (1949).

19. J.A., pp. 50–1.

20. Id. at 52.

21. In Democrat Printing Co. v. Federal Communications Comm., 1952, 91 U.S. App.D.C. 72, 202 F.2d 298, recently decided by this court, we pointed out that the Commission has power to deviate from the blanket area portions of the Standards where such deviations are found by the Commission to be in the public interest. In the Democrat case, unlike the present one, the record contained no findings or reasons in support thereof that the deviation was in the public interest.

22. J.A., pp. 23–24.

23. J.A., p. 33. This line of inquiry was actually pursued and the proffer made by KLZ, another participant in the hearings. Beaumont, however, joined in making the proffer, ibid., and objected to the examiner's rulings. Id. at 24–34.

24. Id. at 24–34, 46–47.

25. 48 Stat. 1064, 1068 (1934), 47 U.S. C.A. § 154(j).

venience, interest and necessity.[26] And although hearing officers have "[a] large amount of discretion" in determining the permissible scope of cross-examination,[27] under the facts of this case, we think there was an abuse of that discretion.

The record discloses a clear conflict in the parties' contentions with respect to the practicability of an interference-free antenna system.[28] Beaumont offered to prove that "it would be possible to afford complete and adequate protection to all other stations on the [560 kilocycle] channel without suffering any loss of service coverage by [Ozarks]." The issue tendered by this proffer was not whether Beaumont's rather than Ozarks' antenna proposal should have been adopted. It was whether the public interest would be served by a grant to Ozarks with attendant interference when such interference might be eliminated by an antenna design not advanced by Ozarks. Moreover, the proffer raised some question concerning the meaning of Ozarks' testimony to the effect that no "practical" interference-free antenna system could be devised. It is true that six continuances were granted before the hearings in this case began in order to enable Ozarks to devise an acceptable antenna system.[29] And it is likewise true that the record discloses no reason why Beaumont could not have submitted the other antenna designs before the hearings began,[30] thus avoiding the possibility of a

further continuance when the antenna issue was raised during the hearings.[31] On the other hand, the Commission found that Ozarks will interfere with the reception of 59,736 persons, or 7.8 percent of the population presently served by Beaumont, part of whom will be deprived of their only night time service.[32] Beaumont, as we understand it, proposed to show that an antenna system could be erected which would permit these people to continue receiving Beaumont's signal "without suffering any loss of coverage by [Ozarks]."

▓▓ In balancing these competing considerations, we also note the absence of specific notice by rule or otherwise requiring submission of Beaumont's proffered evidence in advance of hearing. Admittedly, advance submission of this technical data would promote efficiency and expedition of the administrative hearings. Nevertheless, we think that under all these circumstances, controlling weight could not be given to the desirability of efficiency and expedition in hearing procedures, thereby foreclosing consideration of factors vital to the issue of whether Ozarks' proposal is consistent with the public interest.

One further matter remains. The Commission failed to make findings on whether there is an actual disparity between the amount of interference the Commission found would be suffered by Beaumont when

26. 48 Stat. 1064, 1082, 47 U.S.C.A. §§ 151, 303; cf. Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 145–146, 60 S.Ct. 437, 84 L.Ed. 656.

27. Reilly v. Pinkus, 1949, 338 U.S. 269, 276, 70 S.Ct. 110, 114, 94 L.Ed. 63; see also Federal Communications Comm. v. WJR, 1949, 337 U.S. 265, 283, 69 S.Ct. 1097, 93 L.Ed. 1353; Pulitzer Pub. Co. v. Federal Communications Comm., 1937, 68 App.D.C. 124, 127, 94 F. 2d 249, 252; H.R.Rep.No.1980, 79th Cong., 2d Sess., p. 37 (1946); Sen.Rep. No.752, 79th Cong., 1st Sess., pp. 22–3 (1945). The Administrative Procedure Act provides merely that "[e]very party shall have the right * * * to conduct such cross-examination as may be required for a full and true disclosure of the facts." 60 Stat. 237, 241 (1946), 5 U.S.C.A. § 1006(c).

28. Cf. Reilly v. Pinkus, 1949, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63.

29. This is perhaps some indication of the importance which the Commission attached to this issue.

30. A similar procedure was followed by the intervenor in American Broadcasting Co. v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 343, 179 F.2d 437.

31. Appellee argues that such a continuance might have been necessary in order to give Ozarks time to prepare rebuttal testimony on the technical aspects of the antenna systems covered in the proffer of proof as well as to give notice to any parties who might be affected should the Commission have decided to consider one of the systems as an alternate proposal. See J.A., pp. 24–34.

32. J.A., pp. 42–43.

**312**

the conditional grant was made in 1947, and the amount of such interference found by the Commission in the present proceedings. If the amount proved in the present proceeding exceeds the amount found by the Commission in 1947, Beaumont was entitled to a comparative hearing on the issue of whether the excess was in the public interest.[33] The parties now ask us to say whether such a disparity exists. But this involves a technical question of fact which the Commission must determine initially.

Remanded for further proceedings in accordance with this opinion.

---

33. Cf. Radio Station WOW, Inc., v. Federal Communications Comm., 1950, 87 U. S.App.D.C. 226, 184 F.2d 257.