## FEDERAL COMMUNICATIONS COMMISSION v. POTTSVILLE BROADCASTING CO.

No. 265.   Argued January 11, 1940.—Decided January 29, 1940.

Solicitor General Jackson, with whom Messrs. Warner W. Gardner, Robert M. Cooper, William J. Dempsey, William C. Koplovitz, and Benedict P. Cottone were on the brief, for petitioner.

Messrs. Charles D. Drayton and Eliot C. Lovett for respondent.

The Court of Appeals has the same power to issue mandamus to protect its jurisdiction in this case as it does in cases on appeal from the District Court.

The respondent exhausted its administrative remedy before resorting to the court below, and it has no plain, speedy and adequate remedy at law.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The court below issued a writ of mandamus against the Federal Communications Commission, and, because important issues of administrative law are involved, we brought the case here. 308 U. S. 535. We are called upon to ascertain and enforce the spheres of authority which Congress has given to the Commission and the courts, respectively, through its scheme for the regula-

tion of radio broadcasting in the Communications Act of 1934, c. 652, 48 Stat. 1064, as amended by the Act of May 20, 1937, c. 229, 50 Stat. 189; 47 U. S. C. § 151.

Adequate appreciation of the facts presently to be summarized requires that they be set in their legislative framework. In its essentials the Communications Act of 1934 derives from the Federal Radio Act of 1927, c. 169, 44 Stat. 1162, as amended, 46 Stat. 844. By this Act Congress, in order to protect the national interest involved in the new and far-reaching science of broadcasting, formulated a unified and comprehensive regulatory system for the industry.[1] The common factors in the administration of the various statutes by which Congress had supervised the different modes of communication led to the creation, in the Act of 1934, of the Communications Commission. But the objectives of the legislation have remained substantially unaltered since 1927.

Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field. To avoid this Congress provided for a system of permits and licenses. Licenses were not to be granted for longer than three years. Communications Act of 1934, Title iii, § 307 (d). No license was to be "construed to create any right, beyond the terms, conditions, and periods of the license." Ibid., § 301. In granting or withholding permits for the construction of stations, and in granting, denying, modifying or revoking licenses for the operation of stations, "public

---

[1] For the legislative history of the Act of 1927, see H. Rep. No. 464, S. Rep. No. 772, 69th Cong., 1st Sess.; 67 Cong. Rec. 5473–5504, 5555–86; 5645–47; 12335–59; 12480, 12497–12508, 12614–18; 68 Cong. Rec. 2556–80, 2750–51, 2869–82, 3025–39, 3117–34, 3257–62, 3329–36, 3569–71, 4109–55. A summary of the operation of previous regulatory laws may be found in Herring and Gross, Telecommunications, pp. 239–45.

convenience, interest, or necessity" was the touchstone for the exercise of the Commission's authority. While this criterion is as concrete as the complicated factors for judgment in such a field of delegated authority permit, it serves as a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy. Necessarily, therefore, the subordinate questions of procedure in ascertaining the public interest, when the Commission's licensing authority is invoked—the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions—were explicitly and by implication left to the Commission's own devising, so long, of course, as it observes the basic requirements designed for the protection of private as well as public interest. *Ibid.*, Title I, § 4 (j). Underlying the whole law is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors. Thus, it is highly significant that although investment in broadcasting stations may be large, a license may not be issued for more than three years; and in deciding whether to renew the license, just as in deciding whether to issue it in the first place, the Commission must judge by the standard of "public convenience, interest, or necessity." The Communications Act is not designed primarily as a new code for the adjustment of conflicting private rights through adjudication. Rather it expresses a desire on the part of Congress to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission.[2]

[2] Since the beginning of regulation under the Act of 1927 comparative considerations have governed the application of standards of

Against this background the facts of the present case fall into proper perspective. In May, 1936, The Pottsville Broadcasting Company, respondent here, sought from the Commission a permit under § 319 *Ibid.*, Title iii, for the construction of a broadcasting station at Pottsville, Pennsylvania. The Commission denied this application on two grounds: (1) that the respondent was financially disqualified; and (2) that the applicant did not sufficiently represent local interests in the community which the proposed station was to serve. From this denial of its application respondent appealed to the court below. That tribunal withheld judgment on the second ground of the Commission's decision, for it did not deem this to have controlled the Commission's judgment. But, finding the Commission's conclusion regarding the respondent's lack of financial qualification to have been based on an erroneous understanding of Pennsylvania law, the Court of Appeals reversed the decision and ordered the "cause . . . remanded to the . . . Communications Commission for reconsideration in accordance with the views expressed." *Pottsville Broadcasting Co.* v.

---

"public convenience, interest, or necessity" laid down by the law. ". . . the commission desires to point out that the test—'public interest, convenience, or necessity'—becomes a matter of a comparative and not an absolute standard when applied to broadcasting stations. Since the number of channels is limited and the number of persons desiring to broadcast is far greater than can be accommodated, the commission must determine from among the applicants before it which of them will, if licensed, best serve the public. In a measure, perhaps, all of them give more or less service. Those who give the least, however, must be sacrificed for those who give the most. The emphasis must be first and foremost on the interest, the convenience, and the necessity of the listening public, and not on the interest, convenience, or necessity of the individual broadcaster or the advertiser." Second Annual Report, Federal Radio Commission, 1928, pp. 169–70.

*Federal Communications Commission,* 69 App. D. C. 7; 98 F. 2d 288.

Following this remand, respondent petitioned the Commission to grant its original application. Instead of doing so, the Commission set for argument respondent's application along with two rival applications for the same facilities. The latter applications had been filed subsequently to that of respondent and hearings had been held on them by the Commission in a consolidated proceeding, but they were still undisposed of when the respondent's case returned to the Commission. With three applications for the same facilities thus before it, and the facts regarding each having theretofore been explored by appropriate procedure, the Commission directed that all three be set down for argument before it to determine which, "on a comparative basis" "in the judgment of the Commission will best serve public interest." At this stage of the proceedings, respondents sought and obtained from the Court of Appeals the writ of mandamus now under review. That writ commanded the Commission to set aside its order designating respondent's application "for hearing on a comparative basis" with the other two, and "to hear and reconsider the application" of The Pottsville Broadcasting Company "on the basis of the record as originally made and in accordance with the opinions" of the Court of Appeals in the original review (69 App. D. C. 7; 98 F. 2d 288), and in the mandamus proceedings. *Pottsville Broadcasting Co. v. Federal Communications Commission,* 70 App. D. C. 157; 105 F. 2d 36.

The Court of Appeals invoked against the Commission the familiar doctrine that a lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid at rest. See *In re Sanford Fork & Tool Co.,* 160 U. S. 247, 255–56. That proposition is indisputable, but it does not tell us

what issues were laid at rest. Compare *Sprague* v. *Ti-conic Bank,* 307 U. S. 161. Nor is a court's interpretation of the scope of its own mandate necessarily conclusive. To be sure the court that issues a mandate is normally the best judge of its content, on the general theory that the author of a document is ordinarily the authoritative interpreter of its purposes. But it is not even true that a lower court's interpretation of its mandate is controlling here. Compare *United States* v. *Morgan,* 307 U. S. 183. Therefore, we would not be foreclosed by the interpretation which the Court of Appeals gave to its mandate, even if it had been directed to a lower court.

A much deeper issue, however, is here involved. This was not a mandate from court to court but from a court to an administrative agency. What is in issue is not the relationship of federal courts *inter se*—a relationship defined largely by the courts themselves—but the due observance by courts of the distribution of authority made by Congress as between its power to regulate commerce and the reviewing power which it has conferred upon the courts under Article III of the Constitution. A review by a federal court of the action of a lower court is only one phase of a single unified process. But to the extent that a federal court is authorized to review an administrative act, there is superimposed upon the enforcement of legislative policy through administrative control a different process from that out of which the administrative action under review ensued. The technical rules derived from the interrelationship of judicial tribunals forming a hierarchical system are taken out of their environment when mechanically applied to determine the extent to which Congressional power, exercised through a delegated agency, can be controlled within the limited scope of "judicial power" conferred by Congress under the Constitution.

142

Courts, like other organisms, represent an interplay of form and function. The history of Anglo-American courts and the more or less narrowly defined range of their staple business have determined the basic characteristics of trial procedure, the rules of evidence, and the general principles of appellate review. Modern administrative tribunals are the outgrowth of conditions far different from those.[3] To a large degree they have been a response to the felt need of governmental supervision over economic enterprise—a supervision which could effectively be exercised neither directly through self-executing legislation nor by the judicial process. That this movement was natural and its extension inevitable, was a quarter century ago the opinion of eminent spokesmen of the law.[4] Perhaps the most striking characteristic of this movement has been the investiture of administrative agencies with power far exceeding and different from the conventional judicial modes for adjusting conflicting claims—modes whereby interested litigants define the scope of the inquiry and determine the data on which the judicial judgment is ultimately based. Administrative agencies have power themselves to initiate inquiry,

[3] See Maitland, The Constitutional History of England, pp. 415–18; Landis, The Administrative Process, *passim*.

[4] See, for instance, the address of Elihu Root as President of the American Bar Association:

"There is one special field of law development which has manifestly become inevitable. We are entering upon the creation of a body of administrative law quite different in its machinery, its remedies, and its necessary safeguards from the old methods of regulation by specific statutes enforced by the courts. . . . There will be no withdrawal from these experiments. We shall go on; we shall expand them, whether we approve theoretically or not, because such agencies furnish protection to rights and obstacles to wrong doing which under our new social and industrial conditions cannot be practically accomplished by the old and simple procedure of legislatures and courts as in the last generation." 41 A. B. A. Rep. 355, 368–69.

or, when their authority is invoked, to control the range of investigation in ascertaining what is to satisfy the requirements of the public interest in relation to the needs of vast regions and sometimes the whole nation in the enjoyment of facilities for transportation, communication and other essential public services.[5]   These differences in origin and function preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.   Thus, this Court has recognized that bodies like the Interstate Commerce Commission, into whose mould Congress has cast more recent administrative agencies, "should not be too narrowly constrained by technical rules as to the admissibility of proof," *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25, 44, should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.[6]   Compare *New England Divisions Case,* 261 U. S. 184.   To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play.   They require that inter-

[5] See *United States* v. *Lowden,* 308 U. S. 225; Herring, Public Administration and the Public Interest, *passim.*

[6] The Communications Commission's Rules of Practice, Rule 106.4, provided that "the Commission will, so far as practicable, endeavor to fix the same date . . . for hearing on all applications which . . . present conflicting claims . . . excepting, however, applications filed after any such application has been designated for hearing."   Respondent contends, and the court below seemed to believe that this rule bound the Commission to give respondent a non-comparative consideration because its application had been set down for hearing before the later and rival applications were filed.   The Commission interprets this rule simply as governing the order in which applications shall be heard, and not touching upon the order in which they shall be acted upon or the manner in which they shall be considered. That interpretation is binding upon the courts.   *A. T. & T. Co.* v. *United States,* 299 U. S. 232.

ested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion. But to assimilate the relation of these administrative bodies and the courts to the relationship between lower and upper courts is to disregard the origin and purposes of the movement for administrative regulation and at the same time to disregard the traditional scope, however far-reaching, of the judicial process. Unless these vital differentiations between the functions of judicial and administrative tribunals are observed, courts will stray outside their province and read the laws of Congress through the distorting lenses of inapplicable legal doctrine.

Under the Radio Act of 1927 as originally passed, the Court of Appeals was authorized in reviewing action of the Radio Commission to "alter or revise the decision appealed from and enter such judgment as to it may seem just." § 16 of the Radio Act of 1927, 44 Stat. 1169. Thereby the Court of Appeals was constituted "a superior and revising agency in the same field" as that in which the Radio Commission acted: *Federal Radio Comm'n v. General Electric Co.*, 281 U. S. 464, 467. Since the power thus given was administrative rather than judicial, the appellate jurisdiction of this Court could not be invoked. *Federal Radio Comm'n v. General Electric Co., supra.* To lay the basis for review here, Congress amended § 16 so as to terminate the administrative oversight of the Court of Appeals. c. 788, 46 Stat. 844. In "sharp contrast with the previous grant of authority" the court was restricted to a purely judicial review. "Whether the Commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with the legal requirements which fix the province of the Commission and govern its action, are appropriate

questions for judicial decision."¹ *Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266, 276.

On review the court may thus correct errors of law and on remand the Commission is bound to act upon the correction. *Federal Power Comm'n* v. *Pacific Co.,* 307 U. S. 156. But an administrative determination in which is imbedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge. Cf. *Ford Motor Co.* v. *Labor Board,* 305 U. S. 364.

The Commission's responsibility at all times is to measure applications by the standard of "public convenience, interest, or necessity." The Commission originally found respondent's application inconsistent with the public interest because of an erroneous view regarding the law of Pennsylvania. The Court of Appeals laid bare that error, and, in compelling obedience to its correction, exhausted the only power which Congress gave it. At this point the Commission was again charged with the duty of judging the application in the light of "public convenience, interest, or necessity." The fact that in its first disposition the Commission had committed a legal error did not create rights of priority in the respondent, as against the later applicants, which it would not have otherwise possessed. Only Congress could confer such a priority. It has not done so. The Court of Appeals cannot write the principle of priority into the statute as an indirect result of its power to scrutinize legal errors in the first of an allowable series of administrative actions. Such an implication from the curtailed review allowed by the Communications Act is at war with the basic policy underlying the statute. It would mean that for practical purposes the contingencies of judicial review and of litigation, rather than the public interest,

would be decisive factors in determining which of several pending applications was to be granted.

It is, however, urged upon us that if all matters of administrative discretion remain open for determination on remand after reversal, a succession of single determinations upon single legal issues is possible with resulting delay and hardship to the applicant. It is always easy to conjure up extreme and even oppressive possibilities in the exertion of authority. But courts are not charged with general guardianship against all potential mischief in the complicated tasks of government. The present case makes timely the reminder that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. Ry. Co.* v. *May*, 194 U. S. 267, 270. Congress which creates and sustains these agencies must be trusted to correct whatever defects experience may reveal. Interference by the courts is not conducive to the development of habits of responsibility in administrative agencies. Anglo-American courts as we now know them are themselves in no small measure the product of a historic process.

The judgment is reversed, with directions to dissolve the writ of mandamus and to dismiss respondent's petition.

*Reversed.*

MR. JUSTICE McREYNOLDS concurs in the result.