**GRANDVIEW DAIRY, Inc., v. JONES, War Food Adm'r., et al.**

No. 310, Docket 20233.

Circuit Court of Appeals, Second Circuit.

July 17, 1946.

Writ of Certiorari Denied Dec. 9, 1946.

See 67 S.Ct. 355.

Harry L. Marcus, of Brooklyn, N. Y. (Herbert L. Maltinsky, of Brooklyn, N. Y., of counsel), for Grandview Dairy, Inc., plaintiff-appellant.

W. Carroll Hunter, Sp. Asst. to Atty. Gen., Karl R. Price and Katherine A. Markwell, Attys., United States Department of Agriculture, both of Washington, D. C., Wendell Berge, Asst. Atty. Gen., J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., and J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., for Marvin Jones, War Food Administrator, and Claude R.

Wickard, Secretary of Agriculture of the United States, defendants-appellees.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

A Milk Order was issued by the Secretary of Agriculture pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937. 50 Stat. 246, 7 U.S.C.A. §§ 601, 608c. The order is known as Federal Milk Order No. 27 as amended, and concerns the New York metropolitan marketing area. It defines a "producer" as any person who produces milk which is delivered to a handler at a plant approved by any health authority for the receiving of milk to be sold in the marketing area, and defines a "handler" as any person who engages in the handling of milk or cream received at a plant approved by any health authority for the receiving of milk to be sold in the marketing area. 7 C.F.R. (1940 Supp.) Sec. 927.1(e) (f).

The general offices of the plaintiff, Grandview Dairy Inc., are located at 60-71 Metropolitan Avenue, Ridgewood, Queens, New York, which is inside the marketing area. A milk distributing plant is maintained at the location of that office. Country stations for receiving milk from producers are maintained by the plaintiff at Webster Crossing and Lakeville, Livingston County, New York; Arkport, Steuben County, New York, and Bear Lake, Warren County, Pennsylvania. The plaintiff is also engaged in the manufacture of milk products at each of the above places except Ridgewood and Lakeville.

7 C.F.R. (1940 Supp.) Sec. 927.3 provides that all milk received during any month by handlers from producers shall be classified, and Sec. 927.4 fixes minimum prices to be paid to the producers for the different classes. Each handler is required to report to the Milk Administrator the quantity of milk used in each class. The total of the use value of all handlers [less the total allowance made to all such handlers as have diverted excess fluid milk into market products under the terms of Sec. 927.7(f)] is divided by the total quantity of milk received from all producers.

The result is announced by the Milk Administrator as the uniform price to be paid by all handlers to all producers. The variance among handlers in the percentage of milk used in a given class will normally mean that the total use value for a particular handler may be greater or less than the total payments at the uniform price required to be made by him to his producer. Any handler for whom there is a plus difference is required to pay the difference into the Producers-Settlement-Fund, while any handler for whom there is a minus difference is entitled to withdraw the difference from the fund. Payments into the fund constitute the only source of withdrawal from the fund. This price mechanism is applicable to each monthly delivery for milk. Handlers are entitled to an allowance paid out of the Producers-Settlement-Fund known as "marketing service" or "diversion" payments for diverting excess fluid milk into milk products. The uniform prices paid to producers are reduced as against the handlers to the extent of the aggregate amount of such allowance. Diversion allowances may be had where the plant of the handler is "equipped only" for the receiving of milk for disposition in the marketing area. The plant of diversion must be a second plant located outside the marketing area.

The plaintiff was refused payment for the diversion of excess milk into milk products during the monthly delivery period August 1940 through February 1941, at its place of business at Webster Crossing, Livingston County, New York, where it had both a receiving and a manufacturing plant.

In support of plaintiff's application for an allowance aggregating $23,974.31 it states that the milk was received at a building equipped only for the receipt of milk for disposition in the marketing area, and diverted into milk products in an adjacent building approximately 50 feet away to which it was moved from the receiving building by means of a pipe line. The Milk Administrator denied the application for the reason that he regarded the two buildings as constituting a single plant equipped not only for the receipt of milk but also for the making of milk products. Thereupon plaintiff petitioned the War Food Administrator for the allowances contending that the two buildings were in reality two separate plants—one a receiving, and the other a manufacturing plant—within the meaning of the allowance provisions of the order. It further contended that in any event a prior ruling of the Assistant Secretary of Agriculture in a similar administrative proceeding in which the plaintiff was held entitled to an allowance for milk diverted during the month of June 1940 from its receiving to its manufacturing plant at Webster Crossing precludes a contrary ruling for the subsequent months from August 1940 to February 1941 inclusive. These contentions were denied, whereupon the plaintiff appealed to the District Court, which affirmed the action of the War Food Administrator. From the judgment of the District Court the present appeal has been taken.

In our opinion the disposition of each contention was correct and the summary judgment denying the plaintiff's application for an allowance and granting the defendant's motion for the dismissal of plaintiff's complaint should be affirmed.

The purpose of the creation of the Producers-Settlement-Fund was to deal with the troublesome surplus milk problem which arises during the periods of the year when the milk supply is far greater than needed for consumption. Such a surplus, however, must necessarily occur during those periods if there are to be enough cows to furnish the requisite supply at periods when the milk yield is less. The remedy afforded by the Agricultural Adjustment Act was to avoid surpluses of milk which flood the metropolitan market during the spring and summer seasons by inducing handlers to divert them into butter, cheese or other products through the payment out of the Producers-Settlement-Fund of what amounts to a bonus to those handlers who divert some of the raw milk to the manufacture of milk products.

7 C.F.R. (1940 Supp.) Sec. 927.7(f) provides for such claims as are sought to be asserted here and permits allowance for diversion only "with respect to milk re-

ceived from a plant equipped only for the receiving and shipping of milk to the marketing area which was moved to a second plant outside of the marketing area and there separated into cream and skim milk or manufactured."

The question, which the War Food Administrator and the District Court answered in the negative, is whether the plaintiff's establishment at Webster Crossing was one plant "equipped only for the receiving and shipping of milk to the marketing area," with another plant 50 feet away used only for manufacturing products; or whether the two buildings conducted as they were under the same management and personnel were a single plant chiefly engaged in the manufacture of milk products.

The War Food Administrator made the following findings which are supported by substantial evidence and justify his conclusion that the plaintiff operated one and not two plants:

"8. The distance between Building No. 1 and Building No. 2 was approximately 50 feet. The intervening space was vacant. During each of the months from August, 1940 through March, 1941, inclusive, the two buildings were connected by (a) a removable, sanitary pipe-line for the movement of milk between the buildings; (b) a conduit for steam, for heating and power purposes (the unit for producing the steam for both buildings was in Building No. 1); (c) water pipes; and (d) wires for the transmission of electricity for lighting and power purposes (there was a single meter to measure the electric power used in both buildings, and such meter was located on a pole outside of Building No. 2). The milk moved from Building No. 1 to Building No. 2 was separated, in Building No. 2, into skim milk and cream or was manufactured, and utilized so as to classify it in the various classes as prescribed by the order. The office, for both buildings, was located in Building No. 2. The only telephone at the two buildings was located in the office. All of the records relative to the handling of milk or milk products, in either or both buildings, were kept in the office. There was only one superintendent for the two

buildings, and he had one assistant. There was only one boiler for both buildings, and it was situated in Building No. 1. The heat for the preheater in Building No. 2 came from the boiler in Building No. 1. The heat for pasteurizing in Building No. 2 came from the boiler in Building No. 1. The hot water for use in Building No. 2 came from the boiler in Building No. 1. As operated during the period involved, Building No. 2 was completely dependent upon Building No. 1. If any supply of milk was unloaded directly at Building No. 2, it was insignificant in quantity and, from the standpoint of physical nature and equipment of Buildings No. 1 and No. 2, by resort to a wholly abnormal method.

"9. The operations of petitioner at Webster Crossing from 1926 until 1931, 1932 or 1933, did not extend to manufactured products. Desiring to expand its enterprise at Webster Crossing to include manufacturing, Building No. 2, was constructed in 1931, 1932 or 1933 because there was not sufficient room in Building No. 1 to install manufacturing equipment. Thereafter, products manufactured from skim were made in Building No. 2. Prior to August 20, 1940, Building No. 1 was approved by the Health Department, City of New York as a 'pasteurizing plant' but on that date the approval was modified to a 'creamery' approval. In January, 1939, Building No. 2 received a separate approval as a 'pasteurizing plant.' Prior to January, 1939, manufacturing operations had been carried on in Building No. 2 but whether original approval of Building No. 1 applied to Building No. 2 also is not clear. The Health Department, City of New York, could have issued one approval for both Building No. 1 and Building No. 2, as operated during the period pertinent here."

█ We can see no practical difference between a building one part of which is used for receiving fluid milk and another for making milk products from the fluid and the two contiguous buildings of the plaintiff which were connected by a pipe line through which the milk was delivered from the first to the second. We think that it was within the province of the War Food

Administrator to treat situations so nearly identical as equivalents of one another.

There was a prior administrative ruling upon an application by the plaintiff for a diversion allowance for the month of June 1940. In the present proceeding the plaintiff seeks to invoke the doctrine of res judicata on the ground that no substantial change in the operation of the establishment at Webster Crossing is shown on comparison of the evidence in the two proceedings. The strict doctrine of res judicata would not in any event apply for the reason that the causes of action in the two proceedings were not the same since they involved diversion allowances for different periods. The question remains whether there was an estoppel by judgment because of the prior ruling that the first unit at Webster Crossing was equipped only for the receiving and shipping of milk to the marketing area, and the contiguous unit was a separate plant for manufacturing milk products to which raw milk was delivered from the first unit. The diversion allowance was granted for June 1940 because the War Food Administrator held the two buildings separate plants.

It is hard to see how the War Food Administrator can be regarded as precluded from reinterpreting the meaning of what constituted "a plant equipped only for the receiving and shipping of milk to the marketing area" after such a decision as United States v. Stone & Downer Co., 274 U.S. 225, 235, 47 S.Ct. 616, 618, 71 L.Ed. 1013. There it was said that: "circumstances justify limiting the finality of the conclusion in customs controversies to the identical importation. * * * The evidence which may be presented in one case may be much varied in the next. The importance of a classification and its far-reaching effect may not have been fully understood or clearly known when the first litigation was carried through. One large importing house may secure a judgment in its favor from the Customs Court on a question of fact as to the merchandise of a particular importation or a question of construction in the classifying statute. If that house can rely upon a conclusion in early litigation as one which is to remain final as to it, and not to be reheard in any way, while a similar importation made by another importing house may be tried and heard and a different conclusion reached, a most embarrassing situation is presented. The importing house which has by the principle of the thing adjudged obtained a favorable decision permanently binding on the government will be able to import the goods at a much better rate than that enjoyed by other importing houses, its competitors. Such a result would lead to inequality in the administration of the customs law, to discrimination and to great injustice and confusion."

Considerations similar to those referred to in the foregoing decision would seem to be applicable to the situation presented in the case at bar. In Wallace Corp. v. National Labor Board, 323 U.S. 248, 253, 65 S.Ct. 238, 89 L.Ed. 216, the Supreme Court employed similar reasoning in dealing with the effect of rulings under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Cf. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 84 L.Ed. 656. We reached a like result in Stoddard v. Commissioner, 2 Cir., 141 F.2d 76, 80, when we held that a determination that a taxpayer's activities in one year were of a business nature did not create an estoppel binding upon the Tax Court in dealing with a similar question that arose in a subsequent tax year.

Such decisions as Tait v. Western Maryland R. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405, and Commissioner v. Western Union Tel. Co., 2 Cir., 141 F.2d 774, 778, if they be regarded as applicable to administrative tribunals under any circumstances, do not govern the present situation. In both cases the prior decisions, which were held to create estoppels by judgment, were based on a historical document, such as a bond or a lease, and were not, as here, determinable by conditions that might change through human intervention. So also is the effect of Henricksen v. Seward, 9 Cir., 135 F.2d 986, 150 A.L.R. 1; Engineer's Club v. United States, 42 F.Supp. 182, 95 Ct.Cl. 42; Cam-

pana Corp. v. Harrison, 7 Cir., 135 F.2d 334; Stoddard v. Commissioner, 2 Cir., 141 F.2d 76; Monteith Bros. Co. v. United States, 7 Cir., 142 F.2d 139; Commissioner v. Security-First Nat. Bank, 9 Cir., 148 F.2d 937.

■ We recently applied a similar rule in The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 152 A.L.R. 1187, in which we held that valuations of cemetery lots as a basis for computing capital gains for previous tax years were not conclusive in assessing gains for subsequent years, because a fact found in an earlier action could not be used as a basis from which to reason to an "operative" or "ultimate" fact in a later action. In the case at bar, the facts found by the War Food Administrator necessarily might vary with changing conditions and, whether they did or did not, could not be used to determine the ultimate fact of whether there were one or two plants. Even if the ultimate facts had been the same, the question whether there was a "plant equipped only for the receiving and shipping of milk to the marketing area" was one of law and should be open to revision in circumstances like the present. Restatement of Judgments, § 70.

Judgment affirmed.

L. HAND, Circuit Judge (concurring).

As to the point of estoppel, I concur upon the authority of The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 152 A.L.R. 1187, and upon that alone. No discussion of the confused question as to how far the doctrine of res judicata should go in cases like this is necessary; and I cannot help feeling that what we are saying will not serve to clarify it. It is enough that, even though the doctrine applies to such cases in the strictest sense, it would not cover the situation at bar.