**UNITED STATES v. CAFFEY,**
District Judge.

Docket No. 19396.

Circuit Court of Appeals, Second Circuit.

Oct. 28, 1947.

Leonard J. Emmerglick and Kenneth Kimble, both of Washington, D. C., and Horace H. Robbins, of New York City, for petitioner.

William Watson Smith, Frank B. Ingersoll and Leon E. Hickman, all of Pittsburgh, Pa., and Charles E. Hughes, Jr., and L. Homer Surbeck, both of New York City, opposed.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

We reversed the judgment of the district court in this cause in an opinion filed March 12, 1945,[1] and our mandate went down on March 28th. The district court entered a judgment on the mandate on April 23, 1946, before which on September 21, 1945, the Surplus Property Board had made a report to Congress on "aluminum plants and facilities"; and after which the War Assets Administration filed a First Supplementary Report on February 12, 1947. No hearings in the action appear to have been had in the district court, but on March 31, 1947, "Alcoa"—to adopt the name which we used in our original opinion—filed in the district court a petition, invoking the jurisdiction of that court, reserved under a provision in Article Twelve of the decree of April 23, 1946. This petition prayed that the court enter a final judgment "adjudicating that the Aluminum Company of America no longer has a monopoly of the aluminum ingot market of the United States and that, in consequence of the termination of such monopoly of the aluminum ingot market, competitive conditions have been restored in the aluminum industry." To the petition "Alcoa" annexed ten exhibits, designed to show that the distribution of the producing plants owned by the United States— under the action of the Surplus Property Board and the War Assets Administration —had already progressed so far as definitively to destroy the monopoly which we had held to exist on April 14, 1940 (the date of the last evidence taken in the original trial), and to demand a decree dismissing the complaint, in so far as it asked dissolution of the defendant. The plaintiff moved to dismiss this petition on the ground that the Twelfth Article of the decree of April 23, 1946, was not authorized by our mandate; but Judge Caffey denied the motion on June 2, 1947, declaring that, although it was not open to him to question that a monopoly had existed on August 14, 1940, "Alcoa" was not seeking to relitigate that question, and that "whether or not 'Alcoa' should now be dissolved, a question specifically left open by the Circuit Court of Appeals, cannot be decided until it is determined whether or not it still has a monopoly of the ingot market." The plaintiff filed an answer to this petition on June 12, 1947; and, while the hearing upon these issues was pending, moved

---

[1] United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

in this court on September 11, 1947, for a mandamus, asking the relief that we have quoted at the outset.

The first—and, as we view it, the only—question which we need decide, is as to our jurisdiction to issue the writ. The term of this court in which our mandate was issued ended on September 30, 1945,[2] on which day we lost power to change it except as to matters of form.[3] Our power to review interlocutory orders of the district court by mandamus or the like, exists only as an incident to our jurisdiction to entertain an appeal from a judgment of that court; and it is a power to be exercised only in the most exceptional circumstances.[4] Logically therefore, and also because that is the most convenient course, before deciding whether such circumstances exist here, we must first decide whether we should have jurisdiction over an appeal from another judgment in the action; and if we should not, we must deny the motion. Our only jurisdiction arises from a certificate of the Supreme Court, issued under the proviso to § 29 of Title 15, U.S.C.A., added by the amendment of June 9, 1944,[5] which declares that in an action under the Anti-Trust Laws, if there be no qualified quorum of justices who can hear an appeal from a judgment of the district court, the Supreme Court shall so certify to the proper circuit court of appeals "which court shall thereupon have jurisdiction to hear and determine the appeal in such case." We hold both because of the text, and of the purpose, of this amendment that it confines our jurisdiction to the determination of the appeal certified; and that our power ends with the end of the term at which our mandate goes down, quite as though the mandate finally disposed of the whole litigation. Verbally, there can be no doubt: if the intent had been that we should retain jurisdiction over the action to the end, Congress would not have limited us to a decision of "the appeal"; it would have transferred all ap-

pellate jurisdiction. The purpose of the amendment accords with this construction, for the change was merely to provide a way out of what would otherwise have foreclosed any conclusion of the action. As soon as the situation changes which has barred progress, there is no conceivable reason why the Supreme Court shall not resume its accustomed power of review. The argument that our decision will embarrass that court in deciding a later appeal is patently without basis; nothing is more common than for one court to construe the scope of a judgment of another court—it is a question which always arises upon a plea of res judicata. Hence we hold that, since the plaintiff's motion was to compel the district court to conform its action to our mandate, it must be addressed to the Supreme Court. This would be true, though the membership of that court were the same as when it issued its certificate on June 12, 1944; for, even so, we should have no warrant for assuming that the disqualifications of the justices then existing, still continued until we were so advised by a second certificate.

We are asked to avoid this result by treating the motion as one to "clarify" our mandate, a power which, we are assured, a court must always retain. We may accept it that, since a mandate incorporates the opinion on which it issues, ordinarily the court which issues the mandate will have an advantage in its interpretation.[6] Be that as it may, no such consideration can extend our jurisdiction. We are holding that the Supreme Court alone will have jurisdiction—on appeal or by mandamus—to decide whether the district court has acted in accordance with our mandate; and obviously it cannot do this without deciding what the mandate means. If, under the guise of "clarifying" our opinion, we should put a gloss upon it, we should invade the jurisdiction of the Supreme Court, even though we formally refused to decide whether Judge Caffey's

---

[2] Rule 3 of the Rules of the Circuit Court of Appeals for the Second Circuit.

[3] Fairmont Creamery Co. v. Minnesota, 275 U.S. 70, 72, 48 S.Ct. 97, 72 L.Ed. 168.

[4] In re Fahey, 332 U.S. 258, 67 S.Ct. 1558.

[5] 58 Stat. 272.

[6] Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 141, 60 S.Ct. 437, 84 L.Ed. 656.

order was right or wrong. As well might the court which had entered judgment in one action, be asked to "clarify" its meaning in aid of another court which was called upon to enforce the judgment in another action. The division of jurisdiction which the statute provides, inevitably imposed this limitation upon what perhaps would otherwise have been our powers: the interpretation of our mandate cannot be in the hands of two independent courts. Indeed, the argument probably misapprehends what is meant by "clarifying" an opinion. When a court is called upon to interpret written language, it may be faced, and it usually is, with deciding what the utterers would have said as to an occasion about which they did not express themselves at all, and which usually they did not have in mind. We are rightly accustomed to say that the utterers "intended" what the court puts into their mouths; indeed that is what we mean by interpretation. If all that the parties at bar mean by asking us to "clarify" our opinion, is to interpret it in this sense, they are asking us to do what we have just held to be within the power of the Supreme Court alone: i. e. they are asking us to interpret our mandate as part of the process of deciding whether Judge Caffey's order was in conformity with it. If on the other hand they mean that we shall add words to our mandate which will give it a different scope from that which interpretation, simpliciter, would give it, they are necessarily asking us to exercise a power which ended with the term of court. Conceivably we might have that power, if we had jurisdiction over the second appeal as well as the first.[7] Conceivably, the Supreme Court will have that power on a second appeal, acting as our successor. It is enough that we have no such power now and could not gain it by a second certificate from that court.

To what we have said we wish to add a cautionary possible exception. If our mandate had disposed of the whole litigation, leaving nothing but ministerial acts to be done, we will not say that our jurisdiction would necessarily have ended when it was filed; arguendo, we will assume that we should have the power to compel its execution. The difference between that and the jurisdiction we are disclaiming is indeed 'one of degree; and we are quite aware that so equivocal a word as "ministerial" solves nothing. Here, however, our mandate left undecided the most substantial issue of all: i. e. dissolution; that was the coup de grace which the plaintiff chiefly desired and still desires, and which the defendant chiefly feared and still fears. It depends upon facts which, for the most part, have come into existence since the record before us was closed, and the outcome was not even foreshadowed in what we decided. Manifestly, if the Supreme Court is now able to act, it should decide it, for it involves the proper reconstruction of one of our great industries. True, the question at bar is not dissolution; but only whether "Alcoa" should be permitted to bring on that issue for trial, or must await the plaintiff's pleasure; more precisely, whether Article Twelve of the decree on mandate was within our mandate. On the face of it, that may seem no more than the kind of procedural detail which might fall within our reserved powers, if we have any. Apparently that is not true; both parties regard the time of decision as of high, perhaps critical, importance, and it does not take much imagination to see that it may be. Indeed, its importance is the plaintiff's justification for resorting to mandamus. Trivial as the point may on the surface appear, we are not therefore disposed to class it among those over which we are assuming that we may retain power; rather we think that it penetrates deeply enough into the "merits" of the issue of dissolution itself, to render any decision of it by us a limitation upon the complete freedom of the Supreme Court in dealing with that issue.

The motion is denied.

---

[7] S. S. Kresge Co. v. Winget Kickernick Co., 8 Cir., 102 F.2d 740.