697 F.2d 1070
 Susanna M. BAGINSKY, Appellee,
v.
The UNITED STATES, Appellant.
 Appeal No. 519-78.
 United States Court of Appeals,
Federal Circuit.
 Jan. 10, 1983.
 
 Robert M. Buchanan, Boston, Mass., argued for appellee. With him on the brief were Laura Steinberg and Sullivan & Worcester, Boston, Mass.
 Allen C. Peters, Arlington, Va., argued for appellant. With him on the brief were Asst. Atty. Gen. J. Paul McGrath, and Walter A. Hall, Veterans Administration, Washington, D.C.
 Before MARKEY, Chief Judge, and FRIEDMAN and KASHIWA, Circuit Judges.
 FRIEDMAN, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the United States Claims Court,* setting aside the termination of the appellee's employment with the Veterans Administration ("VA") as a physician on the ground that prior to such termination the agency had not counseled appellee and provided her with a copy of her proficiency report pursuant to the requirements of its regulations. We reverse and remand to the Claims Court to decide the remaining issue in the case, which it did not reach.
 
 I.
 
 2
 A. The appellee, Susanna Baginsky, is a physician specializing in pathology. In early 1973, she was appointed as Chief of the Laboratory Services at a VA hospital. This was a major post at the hospital, in which she had supervisory responsibility over a sizable number of employees in and for the proper functioning of the various divisions of the laboratory. As VA regulations required, she was given a 3-year probationary appointment. She entered on duty on April 15, 1973.
 
 
 3
 Although Dr. Baginsky apparently is a competent pathologist, the hospital management quickly became dissatisfied with her administration of the laboratory. Indeed, even before she was appointed, Dr. John F. Conlin, the hospital's Chief of Staff who interviewed her and apparently was primarily responsible for her selection, had doubts about her qualifications. In a letter to her that he drafted in April 1973 but did not send, he described certain events in the interview that displeased him and added the following parenthetical note to himself: "(I'm being had!)." A week after Dr. Baginsky's arrival, Dr. Conlin reviewed the unsent letter and added another note: "(I've been had--Bill Maloney was right!)." (emphasis in original). (This referred to Dr. William S. Maloney, the dean of a local medical school who was one of the persons whose approval of the appointment was required. Dr. Maloney originally had told Dr. Conlin that he did not consider Dr. Baginsky qualified to be a chief of service, but withdrew his objection after learning that other doctors had recommended her.)
 
 
 4
 Dr. Baginsky's problems with Dr. Conlin began on the day of her arrival, when "[s]he declined to submit to the 2 to 5 days of orientation which her supervisor had planned for her" and went straight to work in the laboratory. Fdg. 17. When Dr. Baginsky started work, there "were some 'difficult situations' " in the laboratory. The staff, left unsupervised for some time between chiefs, "was divided into feuding groups, and various members of the staff were not on speaking terms with other staff members." Fdg. 18.
 
 
 5
 Dr. Conlin met with Dr. Baginsky on April 26, 1973, 11 days after she started work at the hospital. Dr. Conlin "spoke with [Dr. Baginsky] about personality clashes within [the Laboratory] Service," her proposal to hire technologists (rather than bench-trained technicians), and her conflicts with the Chief of Surgery and the hospital's personnel service. Fdg. 21. Dr. Conlin had an extended discussion with her on October 23, 1973. Fdg. 23. Dr. Conlin's notes show that the October meeting included a " '[g]eneral discussion of unsatisf[actory] operations,' " Dr. Baginsky's " 'harassment' of her personnel and ... the 'general atmosphere of uncertainty and discontent' " Dr. Conlin believed to exist in the laboratory, and the problems between Dr. Baginsky and the personnel service. Fdg. 23.
 
 
 6
 In the fall of 1973, Dr. Baginsky recommended the hiring of a person to fill a critical vacancy in the laboratory for a microbiologist. The person was hired, but the day after he came to work in February 1974, Dr. Baginsky urged that he should immediately be discharged because he was unqualified to do the work. Dr. Conlin "assigned the entire blame for the ... matter" to Dr. Baginsky, who apparently was unaware that she was responsible for verifying the professional qualifications of new laboratory employees. Fdg. 32.
 
 
 7
 VA regulations require the preparation of an annual proficiency report for all physicians. VA Manual, MP-5, pt. II, ch. 6. Dr. Conlin, who prepared the proficiency report for Dr. Baginsky covering the first year of her service (from April 15, 1973 to April 15, 1974), gave her a rating of 52 out of a possible 88. The VA had only two descriptive ratings--"satisfactory" and "unsatisfactory" --and any rating above 38 was "satisfactory." The 52 rating Dr. Conlin gave Dr. Baginsky was the lowest rating he ever had given. He never had given a rating of lower than 60, and his average ratings ranged from the "upper-sixties to the middle-seventies." Fdg. 37. Other VA officials testified that most physicians received ratings in the 65-75 range.
 
 
 8
 In the "comments" section of the report, Dr. Conlin criticized several aspects of Dr. Baginsky's performance. He stated that " '[a]t no time' during" Dr. Baginsky's service as chief of the laboratory "had daily operations in her section 'been conducted in a smooth running fashion,' " and he concluded that " '[d]esire for her retention is contingent upon a substantial improvement in her performance.' " Fdg. 38. Dr. Baginsky was not shown a copy of the April 15, 1974 proficiency report until much later. Dr. Conlin met with Dr. Baginsky on April 22, 1974. In his deposition he testified that at that meeting he "went over the contents" of the report. In her testimony, Dr. Baginsky denied that he had done so.
 
 
 9
 The hospital management's dissatisfaction with Dr. Baginsky's running of the laboratory continued throughout 1974. In August of that year, a survey team the VA Central Office in Washington had selected, made a periodic examination of the hospital. At least five laboratory employees requested individual interviews with the team. The survey report was critical of the laboratory and recommended that a "special sight [sic] visit" be made. That would have been a visit to and examination of the laboratory by a "peer-review group" of "pathologists from other V.A. hospitals," "being a reflection that it's not measuring up." The hospital director approved the recommendation.
 
 
 10
 The VA Central Office advised the hospital that it did not approve a special "sight visit" during an employee's probationary period. It suggested that if Dr. Baginsky's performance was unsatisfactory, the hospital might consider terminating her.
 
 
 11
 On November 15, 1974, Dr. Conlin prepared, and the hospital director signed and forwarded to the VA Central Office, a report describing Dr. Baginsky's deficiencies and recommending termination of her employment. Three days later, Dr. Conlin met with Dr. Baginsky and described a number of areas in which her performance was deficient. Dr. Conlin further testified in his deposition that "[a]t various times I stated to Dr. Baginsky that, 'I am appalled. I am thoroughly dissatisfied.' " Def.Exh. 6 at 93.
 
 
 12
 On December 19, 1974, the hospital received from the VA Central Office authority to remove Dr. Baginsky. Although at the time Dr. Conlin apparently had not definitely decided to take that action, he "saw it as unavoidable; that I had gone as far as I could on counseling." Def.Exh. 6 at 92.
 
 
 13
 On February 3, 1975, six employees of the laboratory submitted to Dr. Conlin various "grievances against" Dr. Baginsky and urged that she "should be removed." A week later, on February 10, 1975, Dr. Conlin prepared a special proficiency report in which he gave her an unsatisfactory rating of 27.5. He showed her a copy of the report on February 14, 1975. After the report had been approved by the hospital director (who raised the rating to 33.5, also an unsatisfactory rating), a copy was sent to Dr. Baginsky on March 4, 1975.
 
 
 14
 In the interim, Dr. Conlin had determined to convene a Professional Standards Board to consider whether Dr. Baginsky's employment should be terminated. On February 14, 1975, Dr. Conlin gave Dr. Baginsky a document entitled "Items for Professional Standards Board Review Concerning DR. SUSANNA BAGINSKY, Chief, Laboratory Service." The document contained 33 numbered paragraphs describing various incidents which Dr. Conlin believed demonstrated Dr. Baginsky's unsuitability for her position.
 
 
 15
 The Board was convened on March 7, 1975. After considering written and oral statements from VA employees, including a written statement from Dr. Baginsky, the Board concluded that Dr. Baginsky's performance was unsatisfactory and recommended that she be dismissed. This was done on May 19, 1975.
 
 
 16
 B. The petition in Dr. Baginsky's suit, which originally was filed in the United States District Court for the District of Massachusetts and transferred to the Court of Claims, sought backpay and reinstatement. It contained three counts. Insofar as here pertinent, count I (the only count the present appeal involves) alleged that the VA had violated its regulations because prior to discharging Dr. Baginsky, the agency had not counseled her as the regulations required. Count II alleged that the VA had denied her due process because the Professional Standards Board had considered material that had not been furnished to her and also evidence of additional charges about which she had not been informed. Count III alleged that there was no "substantial or rational basis" for discharging her.
 
 
 17
 The government moved to dismiss or for summary judgment. The Court of Claims granted summary judgment on and dismissed count III, but denied dismissal or summary judgment with respect to the first two counts. 221 Ct.Cl. 908 (1979).
 
 
 18
 With respect to count I, the court stated that the VA regulation requiring counseling of an employee who had served more than one year of a probationary period before such employee may be dismissed (see infra pp. 1074-1075) "is an important protection for the employee since it gives an opportunity to improve his work and avoid dismissal during the later part of the probationary period." Id. at 911. The court rejected the government's contention that under another provision of the regulation the VA could dismiss a probationary employee whether or not there had been counseling. It stated that "[a]llegations that the dismissal proceeding involved a violation of a regulation that was not apparent on the record of that proceeding would present an issue of material fact requiring a trial," and that "there is a sufficient relationship between the alleged violations in this case and the dismissal to sustain plaintiff's cause of action." Id. at 911-12.
 
 
 19
 Expressing no opinion on whether Dr. Baginsky had "been properly counselled and shown her poor proficiency report," the court remanded the case to the Trial Division "to determine whether plaintiff was shown her proficiency report dated April 15, 1974 at that time or given counselling as the Manual requires." Id. at 912. The court further held that count II of the petition, alleging a denial of due process, also raised factual questions that precluded granting summary judgment.
 
 
 20
 C. On the remand, the trial judge determined to try count I first. He did so because that count would require only a short trial, and if Dr. Baginsky prevailed on it, there would be no need to try count II, which would require a longer trial. Because Dr. Conlin died before the trial began, his deposition testimony and attached exhibits were introduced in evidence. Dr. Baginsky and her husband and three officials of the Veterans Administration testified.
 
 
 21
 The trial judge held that the VA had not complied with the counseling regulations in connection with preparation and issuance of Dr. Baginsky's April 15, 1974 proficiency report. He ruled that the agency's noncompliance with the regulations invalidated the discharge of Dr. Baginsky and that she was entitled to recover backpay and to be reinstated to her position.
 
 II.
 
 22
 In invalidating Dr. Baginsky's discharge, the trial judge interpreted the prior Court of Claims decision in this case as (1) limiting him to determining whether Dr. Baginsky had been properly counseled in connection with the preparation of her 1974 proficiency report and whether that report had been shown to her when it was prepared, and also as (2) indicating that if these questions were answered negatively, Dr. Baginsky's discharge was improper. Although that prior decision may not have been as clear and explicit as it could have been so that the trial judge understandably so interpreted it, it did not restrict the issues on remand as the trial judge believed.
 
 
 23
 The decision of the Court of Claims pointed out that the purpose of the VA counseling requirements is "to provide employees with an opportunity to correct any deficiencies in their performance and thereby to avoid dismissal." The statement at the end of the discussion of count I that the court was remanding to the Trial Division "to determine whether plaintiff was shown her proficiency report dated April 15, 1974 at that time or given counselling as the Manual requires" was not intended to limit the trial judge to considering whether proper counseling was given in connection with that report. Rather, it contemplated a full review of the broader issue whether, prior to her discharge, Dr. Baginsky had been given the counseling the Manual required.
 
 
 24
 Upon laying bare the error by the trial judge, the normal practice would be to remand the case to him for reconsideration under the proper standard. Cf. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 442, 84 L.Ed. 656 (1940). See, for example, Ardell Adams v. United States, 680 F.2d 746, 749 (Ct.Cl.1982). That practice, however, is not inflexible and may be departed from in appropriate circumstances, particularly where, as here, the record leaves no question as to the decision that must result from a remand.
 
 
 25
 In the present case the record is relatively short, and the legal and factual issues are uncomplicated and not difficult to resolve. The case has been pending for more than 3 years. In order to expedite its final resolution, we think it appropriate now for us to decide the counseling issue. Cf. O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951); Cahill v. New York, N.H. & H. R.R., 351 U.S. 183, 188-89, 76 S.Ct. 758, 761, 100 L.Ed. 1075 (1956) (Black, J. dissenting). See, for example, Navajo Tribe of Indians v. United States, 624 F.2d 981, 224 Ct.Cl. 171 (1980), and Minnesota Chippewa Tribe v. United States, 650 F.2d 285, 222 Ct.Cl. 551, 555-56 (1980).
 
 III.
 
 26
 A. The requirements for counseling in the VA regulations that the trial judge found the agency had violated deal with counseling in connection with a physician's annual proficiency report. They provide that "[a] counseling conference will be conducted for marginal or unsatisfactory employees not later than 90 days prior to the due date of the annual report" and that "[f]ailure to correct the deficiencies during the ensuing 30 to 60 days, depending on the circumstances, will be cause for a second counseling conference." VA Manual, D.M. & S. Supplement, MP-5, Part II ("Manual"), paragraphs 6.06c(5), e(2). The trial judge found that Dr. Baginsky had been a marginal employee during her first year of service and that prior to preparing her annual proficiency report (due on April 15, 1974), Dr. Conlin had failed to conduct either the 90-day or the 30- to 60-day counseling conference.
 
 
 27
 The purpose of the counseling procedures is, as noted in the prior Court of Claims decision, to give a physician whose performance is marginal or unsatisfactory the opportunity to improve before his or her proficiency report is prepared. If, despite the counseling, performance does not improve, the usual result is that an employee receives an unsatisfactory rating and discharge proceedings are initiated. The regulations so provide. They state: "In the event there has not been sufficient improvement following the second counseling conference and the employee's performance is unsatisfactory, an unsatisfactory proficiency rating will be assigned the employee, and action will be taken as indicated in paragraph 6.07." Manual, p 6.06e(3). In the case of a temporary employee, such as Dr. Baginsky, paragraph 6.07 provides for the convening of a Professional Standards Board.
 
 
 28
 Further indication that the 90- and 30- to 60-day counseling procedures apply only where an unsatisfactory rating is contemplated on an annual performance report is contained in paragraph 6.06f of the Manual. This provision, which follows a section of the Manual captioned "Unsatisfactory Performance," provides: "If an unsatisfactory rating is contemplated and it has clearly been established that the employee has not been counseled concerning his unsatisfactory service as provided for above, a recommendation will be made to the approving official to delay the annual rating for a period not to exceed 90 days. During this period the employee will be counseled as outlined above. The approving official will assign an annual rating at the end of the period cited above."
 
 
 29
 In the present case, however, Dr. Baginsky was not discharged because she received an unsatisfactory rating on her annual proficiency report. Her rating there was satisfactory. Although the hospital management was disappointed with her performance, Dr. Conlin hoped that she would improve sufficiently to warrant her retention.
 
 
 30
 Dr. Baginsky was discharged as a result of receiving an unsatisfactory rating on a special proficiency report prepared approximately 10 months after her first annual proficiency report. Unlike the requirement for the annual proficiency report, there is no requirement for counseling in connection with the preparation of a special proficiency report containing an unsatisfactory rating. The regulations governing the preparation of proficiency reports have separate sections dealing with annual and special reports. Manual, paragraphs 6.05b & c. The regulations provide that a special proficiency report "will be prepared ... [p]rior to appearance by probationary, temporary full-time, part-time, or intermittent employee before a Professional Standards Board for review ... if more than three months have elapsed since date of last annual report." Manual, p 6.05c(1)(a).
 
 
 31
 B. Although counseling is not required before preparing a special proficiency report containing an unsatisfactory rating, the record shows that Dr. Conlin counseled Dr. Baginsky at least twice prior to preparing her special proficiency report. The VA thus provided her with more than it was required to furnish. The record further shows that during her service as Chief of the Laboratory Service, Dr. Baginsky was informed repeatedly about the deficiencies in her performance and given ample opportunity to correct them.
 
 
 32
 The VA regulations do not specify the form or content of counseling conferences. They state that the conferences are to be "informal and confidential and of such nature as to inform each employee, verbally or in writing, of the manner in which he is performing or failing to perform his assigned duties." Manual, p 6.06c(1). Dr. Conlin agreed that "in essence" the "purpose of the counseling system is an ongoing basis to advise the employees of their strengths and weaknesses." Def.Exh. 6 at 28-29. He stated that he did not notify employees in writing of a counseling conference, which "would usually be on an informal basis." Id. at 60. Dr. Baker, a 25-year VA employee who was the director of the hospital during Dr. Baginsky's service there and Dr. Conlin's superior, and at the time of trial held an important medical post at the Central Office, had had experience in counseling. He described counseling with physicians "generally" as "informal and very seldom is it ever reduced to writing." Transcript at 149.
 
 
 33
 Dr. Conlin testified that he met with Dr. Baginsky a number of times and discussed problems in the laboratory and the respects in which her performance was deficient. Except for one of the meetings, he made informal handwritten notes during the discussions. These notes were transcribed and introduced in evidence. Dr. Conlin listed the notes in response to a request in Dr. Baginsky's interrogatories for notes concerning his "counseling conferences" with her. He also identified various documents "which reported or refer to any counseling conferences actually held with" Dr. Baginsky.
 
 
 34
 Although Dr. Conlin's notes are cryptic, they show that counseling conferences were held in which Dr. Conlin pointed out to Dr. Baginsky her deficiencies. Two meetings are particularly significant in connection with the preparation of the special proficiency report.
 
 
 35
 At a meeting on November 18, 1974, almost 90 days before Dr. Conlin prepared the report, he discussed with her a number of the principal problems in the laboratory service. Among them were "continuing unrest" and the possibility of an "adverse effect" on accreditation. Def.Exh. 3, Item 5. Dr. Conlin met with Dr. Baginsky again on January 21, 1975, and discussed her continuing deficient performance.
 
 
 36
 As noted, Dr. Conlin was not alive at the time of the trial. In her testimony, Dr. Baginsky acknowledged that she had met with Dr. Conlin in February 1975, when he showed her the special proficiency report. Except for that meeting, however, Dr. Baginsky stated that "I don't remember having had any meeting with Dr. Conlin" alone. Transcript at 122. This statement does not contradict the deposition testimony and notes of Dr. Conlin described above, in which he referred to a number of meetings with Dr. Baginsky. The fact that Dr. Baginsky did not remember those meetings is not inconsistent with and does not undermine the other evidence that the meetings took place, nor does it justify us in rejecting that evidence.
 
 
 37
 On the basis of the record before us, we conclude that Dr. Conlin counseled Dr. Baginsky at least twice before preparing the February 1975 special proficiency report, and that, in this counseling, he pointed out to her the respects in which her performance continued to be deficient.
 
 
 38
 C. The remaining question is whether the VA's failure to properly counsel Dr. Baginsky before preparing her April 1974 annual proficiency report and its contemporaneous failure to show her that report, so tainted the subsequent dismissal proceedings based upon the February 1975 special proficiency report (for which she was adequately counseled) that the dismissal cannot stand.
 
 
 39
 In deciding that question, the purpose of the counseling requirement must be borne in mind. As emphasized in the earlier Court of Claims decision, a major objective of the counseling system is "to provide employees with an opportunity to correct any deficiencies in their performance." 221 Ct.Cl. at 912. The court added that if Dr. Baginsky "[h]ad ... been properly counselled and shown her poor proficiency report (and we indicate no views here on that question), she might have been able to improve her performance and avoid dismissal." Id.
 
 
 40
 The latter statement was made as dictum in deciding the government's motion for summary judgment. At that stage of the case, the facts as developed in the present record after trial were not before the court. The court was not aware of the details surrounding the preparation of Dr. Baginsky's February 1975 special proficiency report, including the counseling she received prior to that report. The court did not know of the numerous occasions on which Dr. Conlin and others at the hospital called to Dr. Baginsky's attention the various respects in which her operation and supervision of the laboratory were deficient and her failures to improve the performance of her duties despite receiving this advice.
 
 
 41
 Considering all the circumstances, we cannot say that the lack of counseling in connection with the 1974 annual proficiency report or the failure of the VA to show that report to her at the time of its preparation denied her the opportunity to improve her performance and thus avoid dismissal. Accordingly, we hold that the lack of counseling concerning the annual deficiency report and the failure to show her that report did not invalidate the VA's discharge of Dr. Baginsky following the preparation of her unsatisfactory special proficiency report of February 1975. We therefore sustain her discharge against the challenges to it contained in count I of the petition.
 
 
 42
 The judgment of the United States Claims Court is reversed, and the case is remanded to that court to consider count II of the petition.
 
 
 43
 REVERSED and REMANDED.
 
 
 44
 KASHIWA, Circuit Judge, dissenting in part.
 
 
 45
 I agree with the majority that the prior order of the Court of Claims, 221 Ct.Cl. 908 (1979), contemplated a full review as to whether, prior to her discharge, Dr. Baginsky had been given the counseling the Manual required. The majority, however, determines this previously undecided issue on its own without a remand to the Claims Court. I would instead remand the case to the Claims Court for a determination of the counseling issue. I do not believe that it is proper or desirable for us to make our own initial fact findings on this issue without prior consideration by the Claims Court.
 
 
 46
 This court's jurisdiction is governed by 28 U.S.C. Sec. 1295 (1982). Section 1295(a)(3) provides this court with jurisdiction to review final decisions of the United States Claims Court. That jurisdiction is purely statutory and may not be expanded beyond its statutory grant. See United States v. Young, 544 F.2d 415 (9th Cir.1976), cert. denied, 429 U.S. 1024, 97 S.Ct. 643, 50 L.Ed.2d 626 (1976); Beneficial Industrial Loan Corp. v. Smith, 170 F.2d 44 (3rd Cir.1948), aff'd, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Hatzenbuhler v. Talbot, 132 F.2d 192 (7th Cir.1942). The Claims Court has not been given an opportunity to decide the factual and legal questions of the counseling issue in the instant case. There has been no final decision as to that issue, yet the majority finds it appropriate to usurp the function of the Claims Court and make its own de novo factual findings. The majority fails to recognize that this court and the Claims Court are not a single court with both original and appellate jurisdiction, as was a predecessor court, the Court of Claims. The jurisdiction of this court, like that of other courts of appeals, is exclusively appellate. Cf. Roche v. Evaporated Milk Association, 319 U.S. 21, 63 S.Ct. 938, 87 L.Ed. 1185 (1943). This court does not have any original jurisdiction, that jurisdiction is vested in this instance in the United States Claims Court. 28 U.S.C. Sec. 1491 (1982); Cf. Whitney v. Dick, 202 U.S. 132, 26 S.Ct. 584, 50 L.Ed. 963 (1906).
 
 
 47
 In support of its position the majority cites two Supreme Court cases: O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951); Cahill v. New York, N.H. & H. R.R., 351 U.S. 183, 188-89, 76 S.Ct. 758, 761, 100 L.Ed. 1075 (1956) (Black, J., dissenting). Neither case, however, supports the action taken by the majority today. The first, O'Leary, concerns the Supreme Court's ability to review the record and previously made findings of fact of an administrative body under the substantial evidence standard. In that case an administrative determination had been made that included findings of fact and those findings were subsequently upheld by the district court. The Court of Appeals then reversed on a legal issue but did not reach the factual questions. The Supreme Court reversed the Court of Appeals, found it unnecessary to remand the case and reviewed the record itself. In O'Leary, unlike our case, there had been a full opportunity for the fact finding body to create a complete record and make findings of fact. In our case there has been no opportunity for the fact finder, the Claims Court, to consider the issue and make appropriate findings. Further, the Supreme Court in O'Leary was not concerned with the ability of a court of appeals to make de novo fact findings, but instead simply addressed its ability to review a complete record.
 
 
 48
 In the second case cited by the majority, Cahill, Justice Black in dissent said:
 
 
 49
 We have never held that in every instance where the Court of Appeals has failed to decide a point, we must remand the cause to that Court.
 
 
 50
 Id. at 188, 76 S.Ct. at 761. This statement lends no support to the majority's actions, for it simply speaks to the relation of the Supreme Court to a court of appeals. In Cahill, both courts concerned were appellate courts, while here we are dealing with an appellate court and a court of original jurisdiction. The majority's action in this case, however, turns this court, an appellate court, into an initial fact-finding body like a trial court.
 
 
 51
 Even if the majority's action is proper, its failure to remand the case to the Claims Court is certainly neither necessary nor desirable in the present case. The majority view precludes the trial judge from developing the record further, as he would have been empowered to do had the case been remanded. Further development of the record would have been appropriate in light of the new, broader issue to be resolved. By deciding the case now, on the present record, we have precluded the parties the full opportunity they're entitled to to develop their case. In addition, the majority's decision prevents the trial judge from making credibility judgments that only he, having observed the parties, is able to do. The majority claims the reason for its action is the length of time this case has been pending. This case, however, is not ended by the majority's ruling, since it is remanded for a trial on Count II of the petition. Thus the majority's rationalization of the unusual action it takes today appears dubious.
 
 
 
 *
 Pursuant to order of this court dated October 4, 1982, Judge Spector, on October 8, 1982, entered a final judgment in accordance with his recommended decision of March 5, 1982. We treat the government's exceptions to that decision as an appeal from that final judgment